UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————

UNITED STATES OF AMERICA,
*ex rel.*. MARY SCOTT,

      Plaintiff,

v.

METROPOLITAN HEALTH
CORPORATION, d/b/a METROPOLITAN
HOSPITAL, a Michigan corporation, and
MICHAEL FAAS, an individual, jointly
and severally,

      Defendants.

———————————————————/

Case No. 1:02-CV-485

Hon. Richard Alan Enslen

**<u>OPINION</u>**

The Law is but a Looking Glass;
Not all like the reflections cast.

## A.  BACKGROUND

Defendants Metropolitan Health Corporation, d/b/a Metropolitan Hospital ("Metropolitan")

and Michael Faas (collectively, Defendants) have moved for summary judgment as to all counts of

Plaintiff Mary Scott's Revised Second Amended Complaint except her Count II claim that they

breached her employment contract by failing to fund a matching contribution to her 403(b)

Retirement Supplement Plan.  The Motion has been fully briefed and oral argument is unnecessary

since the parties have been fully heard through their briefing.

### 1. General History

Plaintiff Mary Scott, through counsel, filed the instant suit on July 2, 2002, as a *qui tam*

action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, for the purpose of suing on

behalf of the United States of America concerning false Medicare claims and other related conduct. Upon notice, the United States of America determined to intervene in part and declined to intervene in part. (*See* Dkt. No. 25.)  After the intervention, the United States of America, Metropolitan and others voluntarily settled the *qui tam* claims.  What remained in this suit are the allegations set forth in Plaintiff's Revised Second Amended Complaint.  Plaintiff has alleged in Count I that Defendants violated the anti-retaliation provision of the False Claims Act, § 3730(h), by discharging her and otherwise taking adverse action against her due to legal compliance complaints to corporate officers and attorneys.  Plaintiff has also alleged in Count II that Defendants breached her contract of employment by withholding benefits due her under Metropolitan's Senior Executive Retirement Plan ("SERP")  and by failing to pay her a bonus for 2002.[1]  Count III alleges that Defendants defamed Plaintiff by making intentionally false statements which harmed her reputation and caused her other financial and personal injuries.

## 2. Plaintiff's Background

Plaintiff's academic and work background are set forth in her resume. (Ex. 1 at 1-3.)  She holds a bachelor of arts degree in economics and political science from the University of Michigan in 1986 and a masters of arts degree in business administration from the University of Chicago in 1988.  She worked as a department financial administrator for the University of Chicago Hospitals from 1989-1992.  From 1992 to 1993, she worked as a financial consultant for a hospital consulting group (Executive Consulting Group of Boston, Mass.).  From 1993 to 1996, she worked as a

---

[1]Plaintiff's Response indicates that she has withdrawn her claims for breach of contract relating to the Option It Program. (Pl.'s Resp. at 105 n.69.)  Also, as noted above, a failure to make a 403(b) plan matching contribution is also alleged as part of the Complaint, though Defendants have not sought summary judgment on that issue.

department financial director for the University of Michigan Hospitals in Ann Arbor, Michigan. This position overlapped with financial consulting she did for Healthcare Financial & Operational Consulting (1995-1997), which group had contact with Metropolitan and its related entities.  As a result of the consulting work, Michael Faas (Metropolitan's President and CEO) and its Board, in 1997, appointed her as the Senior Vice President for Network Operations; as such, she assumed the task of insuring the profitability of for-profit businesses (physician groups and other entities) associated with Metropolitan (which itself is a non-profit corporation).  (Ex. 4 & 6.)  This financial responsibility included responsibility for revenue improvement in connection with physician services billing. According to Plaintiff's time line, she acquired added responsibility throughout her employment until her termination.  (Ex. 6.)  Her Vice Presidential duties lasted until she was formally terminated in January 2003, though she was placed on paid administrative leave from Metropolitan much earlier (June 2002) due to allegations of misconduct.  (Rev. Sec. Amend. Compl., ¶¶ 46, 56.)

    In connection with this briefing, the Court has received hundreds of pages of argument and thousands of pages of exhibits telling the saga of Scott's employment with Metropolitan and the reasons for her termination.[2]  Plaintiff's employment experience is described in her deposition testimony as well as her lengthy Affidavit (Ex. 9), which was drafted to contradict statements of employees and officers of Metropolitan.  Given the prolixity of the filings, any synopsis necessarily

_____

[2]Plaintiff has filed "character affidavits" by physicians, administrators and personal acquaintances, which attest that they witnessed acts of good character and that Plaintiff had a reputation for good character both prior to her employment with Metropolitan and afterwards. (Exs. 3A to 3J.)  The Court assumes the truth of those affidavits and that Plaintiff generally has had a reputation for good character.  This character evidence is admissible and pertinent to the defamation count, but not as to the other counts given the dictates of Federal Rule of Evidence 404.

avoids many of the details explained at length in the briefing.  Despite the shortcomings of such a synopsis, the Court believes that its summary adequately captures the essence of this dispute.

### 3. Plaintiff's Hiring

Plaintiff's work with Metropolitan began in June 1996 as an outside consultant.  (Scott Dep. at 35.)  In April 1997, she accepted employment with Butterworth Hospital in Grand Rapids, but continued some consulting with Metropolitan.  (*Id.* at 39.)  During her consulting, she expressed legal compliance (tax and Medicare) concerns relating to Metropolitan's purchase of physician practices.  (Ex. B-1; Faas Aff. (Ex. B), ¶ 3.)  Despite the expression of such concerns, she was hired by Metropolitan with a starting date of December 29, 1997 as Vice President of Network Development.  (Faas Letter of Dec. 23, 1997 (Ex. B-3).)  Faas' letter hiring her is the only written document discussing the essential terms of employment since she was not the subject of a formal employment contract.  (*See* Pl.'s Aff. in Rebuttal to Faas (Ex. 9), ¶ 2.)

### 4. Duties

Plaintiff's own explanation of her initial job responsibilities are given in Plaintiff's Exhibits 4-6.  Plaintiff's explanation, which is similar to that given by legal compliance officer Christine Lawrence, describes Plaintiff's role as a leading manager for Metropolitan's for-profit sister entities. These entities are collectively referred to as "Metropolitan Enterprises."  These entities function to provide billings services for Metropolitan's associated physicians, manage the "Metro Health Plaza" offices, manage the third-party payer relationships for the Hospital and physicians, and perform other tasks generally related to the Hospital's mission.  (Lawrence Aff. (Ex. C), ¶ 5.)  As part of this assignment, Plaintiff was one member of Metropolitan's Compliance Committee, though according to both Plaintiff and Lawrence she rarely attended meetings until February or March 2002.  (*Id.* at

4

¶ 6.) Plaintiff admits the membership, but characterizes it as unimportant since Lawrence, not Plaintiff, was responsible for the Committee agenda. (Pl.'s Aff. in Rebuttal of Lawrence (Ex. 9) at 67, ¶ 3.) Plaintiff also indicates that she did not recognize her attendance as low until Lawrence began to circulate an attendance log in February 2002, and then she attended more meetings. (*Id.*)

Whatever one may think of that assignment and attendance record, Scott, by her own admission, was also assigned to Metropolitan's Billing and Coding Task Force and regarded this as the "most important" legal compliance committee assignment because of its role in private and governmental billings. (Ex. 7 at 31.) The reason Scott's assessment is correct is that such billing and coding determinations, when they are done incorrectly for the purpose of falsely billing the government, will expose the corporate entity, officers and employees to potential criminal and civil liability. According to Plaintiff, she was the only senior level management person who regularly attended these meetings. (*Id.*)

### 5. Problems Arise

Despite Plaintiff's important role, Metropolitan CEO Michael Faas soon had reservations about Plaintiff's interactions with co-workers and subordinates, including the Metropolitan Enterprises' physicians. (Faas Dep. (Ex. D) at 124-25.) To alleviate these conflicts, Faas appointed Dr. Frank Belsito to assume the role of Enterprise physician management with Belsito reporting to Dr. William Cunningham, Metropolitan's Chief Medical Officer. (*Id.*) Plaintiff had "issues" with these physicians, as well as six to eight other high-level management leaders at Metropolitan, whom she asked Faas to fire. (*Id.* at 125-26; Defs.' Ex. B-12.) Plaintiff traces these early disputes with the physicians and Lawrence to a physician v. employee lawsuit on which, she believes, Lawrence took the wrong tact (Lawrence refused to settle). (Pl.'s Aff. in Rebuttal to Lawrence, ¶ 1.) She believes

that Lawrence was motivated by undeserved loyalty to Dr. Cunningham (the brother of the physician involved in the suit). (*Id.*) In any event, the record is murky as to whether, when Scott was assigned the additional responsibility of managing Metropolitan's White and White subsidiary[3] in January 2000, this was because of technical excellence (Plaintiff's view), because she was "kicked upstairs"[4] to avoid an area of incompetence–*i.e.,* interpersonal relations (Defendants' view), or for both reasons.

Regardless, Plaintiff continued to have conflicts with other corporate managers, although she has blamed those conflicts on the other managers. Another source of conflict at Metropolitan was Tim Crowley, Metropolitan's Chief Operations Officer. According to Faas, in Spring 2001, he attempted to avoid further conflict between Crowley and Scott by assigning Scott (after the completion of the spinoff of White and White) the job of improving Metropolitan's revenue cycle (*i.e.,* the not-for-profit hospital itself). (Faas Aff. (Ex. B) at 18-19.) Scott characterizes this as a promotion of sorts. (Pl.'s Aff. in Rebuttal of Faas (Ex. 9) at 7-8, ¶ 11.) It is not disputed, though, that Faas withheld a bonus from Scott in 2001. (Faas Aff. (Ex. B), ¶ 17.)

Plaintiff does, however, dispute Faas' rationale for withholding the bonus–arguing that it was explained to her in a meeting with Faas that the "in fighting" issue was not confined to her and Crowley, but was an issue for all Board members. (Pl.'s Aff. in Rebuttal of Faas ( Ex. 9) at 8, ¶ 12.) Plaintiff also made a secret recording of portions of her meeting with Faas, which portions purport to support the above claim. (*Id.*) At that time, and beforehand, Plaintiff was in the habit of making

---

[3]White and White was Metropolitan's medical supply subsidiary which Plaintiff managed until it was sold off in 2001 to third parties. (Faas Aff. (Defs.' Ex. B), ¶ 18.)

[4]The reference, by the Court, is to Lawrence J. Peter & Raymond Hull, *The Peter Principle* at 27 n. & 36-39 (William Morrow 1969).

secret tape recordings of conversations she had with management and Metropolitan's legal counsel, Jeff Fraser, according to her former assistant, Diane Wiest.  (Wiest Aff. (Ex. H), ¶ 17.)  The circumstances of the recording of those tapes by Plaintiff-- including that the recordings are selective and possibly incomplete, and that portions of the tapes are inaudible--when combined with the furtive and suspicious nature of the taping, and the "accidental" loss of some documented tape recordings, makes those recordings suspect evidence indeed.  Nevertheless, the Court will consider such evidence in the context of the present summary judgment motion.[5]

What is clear from Plaintiff's admissions though, as well as the fact that she felt a need to make secret and selective tape recordings of others, is that she was unhappy with her employment situation with Metropolitan in the fall of 2001.  She says that "the Fall of 2001 . . . was an extremely difficult period for me [because] . . . without a single discussion with me, Faas seemingly stripped me of my areas of oversight through the dissemination of a public document which announced that [Robert/Bob] Smedes would not only have the CFO function, but would take over all external concerns of the Hospital . . . . (Pl.'s Aff. in Rebuttal of Faas (Ex. 9) at 9, ¶ 15.)  This was no accident.  Faas had instituted this change because of Smedes' unique qualifications and as part of Faas' long-term goal to assign Scott work on the Borgess relationship (a dead-end position).  (Faas Aff. (Ex. B) at 29.)  Smedes is a certified public accountant with a successful work history and resume boasting past positions as Director of Michigan's Medicaid program and President and CEO of Blue

_____

[5]Though the Court has elected to review such evidence, the parties should be advised that the Court is of the view that Defendants' Motion *in Limine* Regarding Tape Recordings and Transcripts is well received and would justify the preclusion of the tapes and transcripts were this matter tried given the provisions of Federal Rules of Evidence 403, 1002, 1003, and 1004 and case law pertaining to the common law doctrine of spoliation (*see Welsh v. United States*, 433 F.2d 1239, 1246-48 (6th Cir. 1988)).

7

Care Network.[6]  (Ex. B-7.)  On February 7, 2002, Faas informed Scott's subordinates of the reassignment of all financial duties to Smedes.  (Faas Aff. (Ex. B), ¶ 29.)  Prior to that, Plaintiff knew that something was afoot because she had sent communications in January 2002 to Faas inquiring about her role *vis-a-vis* Smedes, which inquiries went unanswered pending later meetings. (Pl.'s Aff. in Rebuttal of Faas (Ex. 9) at 12-13, ¶ 16.)

### 6. Bob Smedes and the OCI

The emergence of Bob Smedes as the new CFO coincided with another important management initiative.  At the time, Sandy Sefton, the Chief People Officer at Metropolitan, had sold Faas on the idea of using an outside company, Right Management, to conduct a cultural management assessment known as the Organization Cultural Inventory ("OCI").  Faas agreed to the OCI in August 2001; it was announced in October 2001; and it was completed in January 2002. (Sefton Aff. (Ex. E), ¶¶ 6, 10, 13.)  The assessments were based in part on questionnaires completed by a manager's subordinates.  When Scott's subordinates found out about the questionnaire, at least three of them approached Sefton to request assurances that negative action would not come to them due to their assessments of Scott.  (*Id.*, ¶ 13 & E-8.)

Rita Amell of Right Management released the results of the OCI to Scott on February 6, 2002.  (*Id.,* ¶ 14.)  The evening of the February 6, 2002, Scott called one of her subordinates, Kimberly Speese, at her home (after two previous conversations about the OCI at work); Scott told Speese that she, Scott, was very upset about the OCI and wanted to call a meeting the following day to instruct staff to write Rita Amell to demand a revised assessment.  (Speese Aff. (Ex. G), ¶ 7 & G-

---

[6]As his resume suggestions, Smedes was politically well-connected, which was also part of the hiring decision.

2.)  Plaintiff does not dispute that she was upset by the OCI and disclosed this to Speese.  (Pl.'s Aff.

in Rebuttal of Speese (Ex. 9) at 58, ¶ 5.)  However, she characterizes the OCI results as not reflective

of her, particularly since, in her view, Faas was somehow trying to "game" the OCI process to reflect

negatively upon her.[7]   (Id.)

On the following day, Scott had a conversation with Sefton about her displeasure over the

OCI results, which was consistent with Scott's remarks to Speese.  (Sefton Aff. (Ex. E), ¶ 15.)  Scott

then took Sefton to a conference room, where her unit had been gathered; Scott told the group that

they had not evaluated their division correctly and then abruptly left the group to Sefton.  (Id. & Ex.

E-10.)  Sefton then attempted to explain to them that there were no right or wrong answers to the

OCI surveys.  (Id.)  She attempted to discuss these matters later in the day with Scott, but Scott was

not available for discussion.  (Id.)  The same day, Scott sent Faas and Sefton an email describing

how she was "perplexed" by the OCI results and describing the team meeting in the conference room

as reaching a consensus that the OCI reflected the corporate culture generally and not the interactions

of her team members.  (Ex. B-18.)  Scott also restated her contention that the scoring should be

redone because "[e]veryone tells me they love our area and don't want to change anything."  (Id.)[8]

---

[7]How this could be so is not explained by Scott and is not a logical conclusion from the record given that the OCI was used as to all senior management and was both designed and implemented by an independent company (Right Management) based on standard techniques. This is not to say, though, that the OCI process was perfect, a thing certainly recognized by Plaintiff's experts.

[8]The results of the OCI were disclosed in Rita Amell's Expert Report (Ex. I-1) and Plaintiff's exhibits (Exs. 57, 59 & 60).  The OCI has been criticized by Plaintiff's experts Jim Alampi and Chuck Russell (Exs. 53 & 54) for technical reasons–i.e., due to procedural missteps in the evaluation and collection of data, including the inclusion of a non-reporting person, Dr. Bouchard, in the evaluation, and due to the choice of the evaluation method.  Since the results themselves are subject to ample interpretation and criticism, the more interesting matter is how Plaintiff responded to a report she deemed as critical, particularly since the response involved

On February 9 and 10, 2002, Scott, Faas, other officers of Metropolitan (Crowley, Cunningham and Smedes), and selective members of Metropolitan's Board of Directors traveled to Florida for a management conference. While Scott was away, two of her subordinates–Cheryl DeVries and Kim Speese–approached Sefton to disclose their agreement with the OCI results and their concerns about Scott's reaction to the OCI (*i.e.,* fear of vindictive conduct by Scott). (DeVries Aff. (Ex. F), ¶ 11; Speese Aff. (Ex. G), ¶¶ 14-16.) Other employees followed the trail to Sefton and disclosed what can only be described as a history of personally abusive conduct by Scott toward her co-workers and subordinates. (Ex. N, ¶¶ 13-14; Ex. G, ¶¶ 14-16; Ex. F, ¶ 11; Exs. E17-E19; Ex. O, ¶ 6; Ex. Q at 177-78.) Though Plaintiff has generally discounted these complaints as either untrue, exaggerated and/or improperly motivated,[9] she has not discounted that Sefton was approached with the complaints of her subordinates when she was absent.

On February 11, 2002, Right Management (meaning Amell) was busy assimilating Smedes–meaning working to reassign some of Scott's staff to Smedes–in response to previous directions from Faas to Scott's subordinates about this assimilation. (Amell Aff. (Ex. I), ¶ 4.) In the course of doing so, Amell heard complaints from Scott's unit about instructions she had given them to attend the meeting for the purpose of undermining Smedes (*i.e.,* complain that he was unqualified). (*Id.*) These comments were typical of comments that Sefton had heard from Scott's

---

subordinates who provided some of the information upon which the results were based.

[9]The Court must assume, consistent with Plaintiff's testimony, that these complaints are untrue–though the complaints tend to corroborate one another and paint a picture of a boss who ordered staff to her house for late night meetings; forced them to sit on the floor with a growling dog that sometimes bit them (even though no aid was offered); conducted Bible studies at work during work hours; eavesdropped on other executives; and treated people in a generally vindictive and callous manner. If this is fiction, it is well crafted. If this is true, then it is apparent why Faas was desirous of a change in corporate leadership.

subordinates–that she used rough and tumble language concerning Faas (*i.e.,* variously referring to him as Hitler, Satan, and the like).[10]  (*See, e.g.,* Speese Aff. (Ex. G), ¶ 3; Griffith Aff. (Ex. P), ¶¶ 11-12.)  Plaintiff has denied the various name-calling allegations, which denial the Court accepts under the dictates of Rule 56.

### 7. Sefton Gets Faas Involved

On February 13, 2002, Sefton spoke with Faas (who was still in Florida) and informed him of the employee complaints regarding Scott.  (Sefton Aff. (Ex. G), ¶ 19.)  The two agreed to meet after Faas returned from Florida (after February 25, 2002).  (*Id.*)  When Faas returned, he was met by a Memo from Sefton that painted the problem in terms that only a human resources person would have used:

> To: Mike Faas, President & CEO
> From: Sandy Sefton, CPO
> Date: February 26, 2002
> Re: Mary Scott
> _____
>
> Problem Statement Purpose
>
> Review difference and misunderstandings that have occurred between Mary and staff.
>
> Desired Outcome
>
> A.  Create a safe, cooperative and professional environment, in which all employees conduct themselves professionally and are treated courteously, respectfully and with dignity.
>
> B.  To eliminate a "hostile work environment."
>
> Issue: Management Style: Interpersonal Relationships
>
> 1.  OCI depicts your leadership as reviewed by members of your team.

---

[10]Now here is a good example of an out-of-court statement not offered to prove the truth of the matter asserted.  *See* Fed. R. Evid. 801(c).  That is, the statements are offered to prove that Scott is a name-caller, not to prove that Faas is Hitler or Satan.

    2. Manage by fear and intimidation.
    3. Described as "when you're good, you're good" and when "you're bad, you're bad."
       Never know what mood you're in.
    4. Try to find someone to blame/destroy.
    5. Team is strong because they've banded together to support each other against fear of you.

(Ex. E-16.)  The remainder of the Memo described four possible alternatives to achieve the desired outcome: (1) reassign job responsibilities; (2) do nothing; (3) develop a behavioral contract; or (4) terminate Scott.  (*Id.*)  The Memo described the second and fourth alternatives as "high risk." (*Id.*)  Faas received the Memo on February 26, 2002.  (Faas Aff. (Ex. B), ¶ 33.)

When presented with this Memo, Faas determined that he would remove her subordinates and assign her to a temporary dead-end position (the Borgess/Metropolitan relationship).  (*Id.*, ¶ 36.)  The Borgess/Metropolitan merger relationship was exactly such a position because, as Faas knew, the Borgess/Metropolitan merger was not going to happen.  (*Id.*)  Thus, Faas envisioned that Scott would be terminated by May or June of 2002.  (*Id.*)  However, Faas delayed announcing this change until April 17 and 22, 2002, respectively.[11]  (*Id.,* ¶¶ 37-38.)

**8. Let's Sue**

While winds of change were swirling at Metropolitan in February 2002 around the installation of Bob Smedes and questions about the fate of existing vice presidents, including Plaintiff, Scott was, among other things, meeting with her lawyer, Linn Hinds, to contemplate how to sue Metropolitan.  Attorney-client privilege has been waived as to those communications and, it is known, that on February 25, 2002, Hinds sent Scott the following email message:

When we talk about the situation, we need to specifically discuss the issue of which "horse to ride."  Until now, we have talked about the obvious gender discrimination slant.  Your

---

[11]April 17, 2002 was the date scheduled to inform Scott of the change and April 22, 2002 was the date to inform others and make a formal announcement.

most recent information, however, contains possible seeds of a whistle blower approach.  We need to evaluate the strongest approach and go on that basis, whether now or later.  Linn

(Defs.' Ex. K-2.)

On April 17, 2002, as planned, Sefton met with Scott at Faas' direction and told Scott that she was being reassigned and had no choice as to the reassignment (except to resign immediately). (Sefton Aff. (Ex. E), ¶ 22 & Ex. E-19.)  The day prior, Scott had sent an email to Pamela Haan, an attorney for Varnum, Riddering, Schmidt & Howlett ("Varnum"--the firm representing Metropolitan). (Pl.'s Ex. 65, email of 4/16/02.)  The email referenced a discussion they just had and apologized for "dumping that info. on you . . . ."  (*Id.*)  It is unclear from the email what kind of "info" was "dumped," but Plaintiff's Response characterizes the email as reflecting the disclosure of fraudulent Medicare billings.  (Pl's Resp. at 52.)

On April 17, 2002, Plaintiff called attorney Jeff Fraser of Varnum.  Plaintiff's Response indicates that it was a 7:30 a.m. telephone call, but fails to disclose if the call was made to Fraser's home, work or cellular telephone.  (*See* Pl.'s Resp. at 52-53.)  Defendants do cite record evidence concerning this event–Fraser's Affidavit, Defendants' Ex. L, ¶ 2.  This evidence indicates that the telephone call was late in the afternoon on April 17, 2002 and referenced only "significant hospital matters."  (Fraser Aff. (Defs.' Ex. L), ¶ 2.)  In any event, Scott called Fraser on April 18, 2002 and specifically told him that she wished to discuss "Fraud/IRS issues" and Metropolitan's application for a certificate of need.  (*Id.*, ¶ 3.)

Scott's calls to Fraser were followed by meetings on Friday, April 19, 2002 at 6:30 p.m. and Saturday, April 20, 2002 at 10:30 a.m.  (*Id.,* ¶¶ 3-4.)  Scott's attorney (Hinds) was present for these meetings; at the meeting, it was disclosed that Scott had legal compliance concerns relating to Faas'

13

conduct and Fraser informed Scott that her compliance concerns would be investigated and she would be protected from adverse conduct during the investigation. (*Id.,* ¶ 4; Ex. L-2 at R26-05509.) Fraser's notes of those meetings indicate that he recognized at least the potential of "whistleblower" liability given the issues asserted. (Ex. L-2 at R26-05497.) Scott posited her disclosures of compliance issues within an inelegantly titled memorandum, "Non-Exhaustive Summary of Inappropriate Practices of Metropolitan Health Corporation." (Pl.'s Ex. 67.) That document alleged corporate malfeasance including possible errors or intentional malfeasance as to Medicare billings. (*Id.* at 2.)

### 9. Working Under Protocols

On April 22, 2002, Faas announced Scott's job reassignment at a strategic planning meeting. (Faas Aff. (Ex. B), ¶ 38.) However, the decision did not take effect because after the meeting Fraser called Faas and informed him that Scott had made complaints to the Executive Committee of Metropolitan concerning legal compliance and, in light of such complaints, she would report only to the Executive Committee and Fraser during the investigation. (*Id.*) Faas was instructed to make no changes in the organization, to maintain all pertinent documents, and to make the Hospital (as opposed to outside offices, lawyer offices, *etc.*) his primary work location pending the investigation. (*Id.*; *see also* Fraser Aff. (Ex. L), ¶ 3.)

14

During the Monday, April 22, 2002, Executive Committee meeting,[12] Plaintiff and her counsel disclosed a document titled "Issues of Concern," which was a more detailed and polished version of the earlier memorandum. (Fraser Aff. (Ex. L), ¶ 5 & Ex. L-3; Ex. 68.)

Following the Executive Committee meeting, both Plaintiff and Michael Faas were required to sign "protocols" concerning the Executive Board's investigation. Scott's protocol instructed her that she would report to the Board of Directors Executive Committee on an interim basis without change in job assignments or staff, should raise any questions with either Jeff Fraser or Doyle Hayes (Board Chair), should keep the matters confidential, and should maintain all documents, emails and other materials in her control "as is." (Ex. L-4.) Scott signed the protocol indicating agreement to its terms on April 30, 2002. (*Id.*) Faas' protocol had parallel provisions: to not change Mary Scott's position pending the investigation, to treat her with dignity and respect, to maintain documents, emails and other materials "as is," to keep matters confidential, and to have "no issues related to Mary Scott change without direct discussion with and approval from me [referring to Doyle Hayes]." (*Id.*) The document was approved by Faas on April 23, 2002. (*Id*.) Fraser reviewed the protocol requirements with both Faas and Scott prior to their signatures. (Fraser Aff. (Ex. L), ¶ 6.) Fraser also told Scott not to independently investigate or acquire evidence in the workplace, to maintain confidentiality, and to "sit back" and "do her job." (Fraser Dep. (Ex. S) at 246.)

---

[12]Plaintiff has disagreed with Fraser's characterization that the Monday meeting was the "first" meeting between Plaintiff, Varnum attorneys and the Executive Committee. (Pl.'s Aff. in Rebuttal of Fraser (Ex. 9) at 4.) This disagreement, like much of this record, is insignificant. What Mary Scott is referring to is that one Varnum attorney, Jackie Scott, was with Fraser at the April 19-20, 2002 meetings and identified herself then as a Board Member (which she was); the parties do not disagree apparently that other members of the Executive Committee besides Jackie Scott attended the first such meeting on April 22, 2002. May God forgive us all that we have spent valuable moments of our lives with such piddling disagreements.

Beginning on or about April 25, 2002, Fraser and the Executive Board began work on hiring an independent law firm to investigate Scott's "legal compliance" allegations. (*Id.*)  By about May 7, 2002, the Executive Board had retained the law firm of Epstein, Becker & Green ("Epstein Becker") to investigate the "legal compliance" allegations.[13]  (*Id.* See also Pl.'s Exs. 69-70.)  While Epstein Becker was so employed, Fraser himself continued to investigate other matters pertinent to Plaintiff's employment, contractual complaints, and her obedience to the protocol.

Epstein Becker sent Carrie Valiant, a senior member of the firm who had literally written the book on legal issues pertaining to health care fraud.  *See* C. Valiant *et al.*, *Legal Issues in Health Care Fraud and Abuse*: Navigating the Uncertainties (NHLA Focus Series 2nd ed. 1997).   Valiant started by meeting with Scott on May 15, 2002.  (Valiant Aff. (Ex. T), ¶ 3.)  She then informed her that her "charge" was to conduct an independent investigation of the legal compliance issues Scott had asserted.  (*Id.*)  This work included not only investigating and reporting to the Board on legal compliance issues, but also filing required legal notices with affected governmental agencies.  (*See id.*, ¶ 30.)

Despite the two pending investigations, Scott did not get the message that she should wait out the investigations without interference and while maintaining confidentiality.  As mentioned above, Scott disclosed to Wiest (her personal assistant) during this time period that she had tape recordings of past meetings and intended to use the tapes to get Faas.  (Wiest Aff. (Ex. H), ¶ 17.)  Sefton also learned from Wiest and other employees of Scott's intent to sue Faas.  (Sefton Aff. (Ex.

---

[13]The purpose of separate counsel was to avoid any "conflict of interest" which might arise from the fact that Varnum had previously been advising Metropolitan as to certain legal matters which were the subject of some of Plaintiff's compliance charges.  (*See* Valiant Aff. (Defs.' Ex. T), ¶ 7.)

16

E), ¶ 26.)  On April 29, 2002, Scott was observed secretly audiotaping workplace meetings.  (*Id.,* ¶ 28.)  This prompted Fraser to tell Scott to knock off her performance as a secret agent, that is, stop the secret recordings.  (Fraser Aff. (Ex. L), ¶ 7.)

Fraser interviewed Scott's reporting employees as part of his investigation–including Speese, VanderJagt, Devries and Wiest.  These interviews generally confirmed the negative OCI information and the memorandum that Sefton had sent to Faas regarding Scott's management style.  (*See id.,* ¶¶ 12-13, 15-17, 20 & Exs. L-9, L-10, L-12, & L-18.)  Scott, apparently, also told others, such as Wiest, that now was not a good time to offer Fraser constructive criticisms of her in connection with his investigation.  (*Id.,* ¶ 17.)

Due to growing concerns about Scott's continued copying of documents outside her direct control (*i.e.,* documents not maintained by her), Carrie Valiant repeatedly ordered Scott to not do so between May 21 and May 23, 2002.  (Valiant Aff. (Ex. T), ¶¶ 21-23.)  During this time period, Scott apparently threatened to fire Mark VanderJagt because he did not comply with one of her document requests for financial documents.  (VanderJagt Dep. (Ex. Q) at 118, 123.)

**10.  The Minutes**

The truck load of straw that broke the camel's back in terms of Fraser's tolerance of Scott's personal investigation was Scott's treatment of audiotapes and minutes of the February 7, 2002 Metropolitan Enterprises Board meeting.  On April 24, 2002, Wiest was typing the minutes of the meeting for presentation at the next Board meeting based on three tapes Wiest had recorded of the meeting.  Wiest subsequently emailed the minutes to Scott and another administrative assistant (the latter person to assure the document's integrity).  (Exs. H-2 & H-3.)  The following day Wiest caught Scott rifling through her desk saying she was looking for the audiotapes because she believed

17

that the minutes were inaccurate.  (Wiest Aff. (Ex. H), ¶ 15.)  Wiest subsequently asked Scott on several occasions to return the tapes, but the tapes were not returned.  (*Id.*)

Scott, on the subject of the tapes and minutes, concedes Wiest's account for the most part (Scott Aff. in Rebuttal of Wiest (Ex. 9), ¶ 11), but adds an additional account.  According to Scott, she made revisions to the memorandum from memory with the intention of later checking the tapes. (*Id.*)  But she could not find all three tapes and assumed them to be recycled by others in the office. (*Id.*)  Scott admits that she found a single tape containing a portion of the meeting approximately one week after June 12, 2002, but did not disclose the tape because she felt that "Metropolitan was trying to set me up and I wanted to see just how far Metropolitan would go in creating additional lies about me.".  (*Id.*)  She also admits that later in the course of this suit, all three tapes (as well as other tapes) "showed up" and that this was "sheer luck."  (*Id.,* ¶ 12.)

Following the "loss" of the tape, Wiest received the minutes back from Scott in an amended form <u>on May 28, 2002.</u>  (Wiest Aff. (Ex. H), ¶ 19.)  Wiest was concerned that Scott inaccurately amended the minutes and told Fraser what had occurred.  (*Id.,* ¶ 18-19.)

The minutes typed by Wiest contained the following second paragraph under the caption for

<u>PHYSICIAN COMPENSATION MODEL</u>:

> Discussion was held on when the last time the compensation model was reviewed by outside attorney to determine if it would be acceptable under Corporate Compliance.  It was noted that it had been reviewed by Chris Lawrence.  An Addendum was added to the document and was presented and signed by the employed physicians at the July 2001 employed physician quarterly meeting.  It was also noted that this document will be presented to the Executive Committee of the Metropolitan Board of Directors annually for approval.  All salaries are viewed by the Board annually.  Original compensation models were derived from outside consultants with the oversight of Varnum, Riddering, Schmidt and Howlett with ongoing guidance for all enhancements/improvements.  Substantial changes are all presented to the Executive Committee.

(Ex. L-17 at R26-05246.)

The minutes typed by Scott and returned to Wiest included the following paragraph corresponding to the paragraph above:

> Discussion was held on when the last time the compensation model was reviewed by outside attorney to determine if it would be acceptable under Corporate Compliance. Mary requested that outside counsel review the managed Care yearly Adjustment portion of the compensation model. This element of the model had been developed by Dr. Belsito and approved by Mike outside the annual executive committee review. Mary requested that the process and resulting bonus be reviewed for appropriateness.

(*Id.* at Rule 26-05250.)

The minutes typed by Wiest included a second paragraph under the <u>FINANCIAL OVERVIEW</u> caption which stated:

> Action: A motion was made by Dr. William Cunningham and seconded [by] Mary Scott to approve the Metro Health Physician [C]ompensation Model (Attachment A), Resolution of the Board of Directors of Metropolitan Enterprises (Attachment B) and the Financial Statement (Attachment C-1, 2 & 3). Motion carried.

(*Id.* at R26-05248.)

The minutes typed by Scott deleted the entire second paragraph. (*Id.* at R26-05252.)

Other than those two very substantial differences, the minutes were the same.[14] Wiest, who had attended the meeting and listened to all of the tapes, regarded Scott's minutes as inaccurate because: (1) it omitted Scott's oral and gestured second of the compensation model motion; (2) it

---

[14]About the same time, Fraser received another call from Wiest and VanderJagt that VanderJagt had been threatened with discharge if he did not disclose documents to Scott. VanderJagt had apparently told Scott that Fraser had directed him not to disclose the documents and Scott told VanderJagt to countermand those instructions. (Fraser Aff. (Ex. L), ¶ 22.) Scott's rebuttal affidavit does not address this paragraph. (*See* Scott Aff. in Rebuttal of Fraser (Ex. 9) at 87.)

added a request by Scott for independent counsel review which did not occur; and (3) it modified Faas' statements as to the physician compensation model.  (Wiest Aff. (Ex. H), ¶ 19.)

Scott and her counsel have explained the purpose of Scott's edits as follows: (1) to correct an errant attribution of a second to a motion (*i.e.,* Scott claims she did not do so);[15] (2) to correct the omission of her statement requesting involvement of outside counsel perhaps conveyed during a prior meeting; and (3) to modify the record made by Faas to prevent a misapprehension of historical facts conveyed in a prior meeting relating to the physician compensation model.  (*See* Pl.'s Resp. at 61-62; Pl.'s Aff. in Rebuttal of Wiest (Ex. 9), ¶ 14.)  In making these explanations, though, she does not explain how an independent investigator–say a Government attorney investigating health care fraud–could have assessed the truthfulness of Faas' statements if those statements were modified to reflect Scott's intent as to what Faas should have said rather than what Faas actually did say at the meeting.

A brief review of the reporter's transcript of the meeting (which was earlier offered by Scott as evidence of what occurred) conveys the changes that Plaintiff made from the record events.  (*See* Dkt. No. 425, Exs. R-20A & R-20B (also offered as Ex. 7).)   The transcript treks nicely with the hearing agenda and Wiest's minutes.  (*Id.*)  Interestingly, though, Scott has insulted her former assistant by saying that "Wiest does not know the first thing about physician compensation models. She has no capacity to appreciate, record, or testify as to what was accurate or inaccurate about the statements that were being made by Faas . . . ."  (Pl.'s Aff. in Rebuttal of Wiest (Ex. 9), ¶ 14.)  The Court will assume such for the purpose of this record, but all the same it is a dastardly thing to say

---

[15]According to Plaintiff, there was no such motion and, therefore, no second to the motion. (Pl.'s Aff. in Rebuttal of Fraser (Ex. 9) at 93, ¶ 12(K).)

of one's assistant, particularly since it was Mary Scott who announced the meeting with the words, "Diane's going to take the minutes." (Dkt. No. 425, Ex. R-20A at 2), referring to Wiest.

While Diane Wiest's understanding of physician compensation models may have been less acute than that of Plaintiff, the record leaves no doubt that her understanding of the purpose of the recorded minutes (to make an accurate record of what was actually said) and the use of the English language was precise. The first agenda item, discussion of the Physician Compensation Model, included the discussion referenced in Wiest's minutes concerning the use of Varnum in connection with the development of the physician model at the bottom of pages 9 and 10 of the transcript. (*Id.* at 9-10.) The transcript contains no motion by Scott to involve outside counsel there.[16] (*Id.*) The discussion of that Agenda item ends with a discussion of the *Jeffrey Askanazi* case–a matter with which this Court had more than passing experience[17]–true to Wiest's minutes. (*Id.* at 28-30.)

Second on the Agenda was the Corporate Compliance Program (Resolution). This was discussed at length and action (assignment of tasks to Chris Lawrence) was taken at page 38 of the transcript. (*Id.* at 38.)

Third on the Agenda was the Financial Overview. It appears from the transcript that the motion was made and approved in a tacit manner, though the transcript references are vague. Here is the relevant language:

Doctor Cunningham: Do you need approval for this?

---

[16]For the record, the Court has also reviewed the copied tapes of the meeting and believes that the transcript is true to the tapes.

[17]Askanazi's case, 1:98-cr-130, was assigned to the Honorable Robert Holmes Bell, but its companion case, *United States v. United Memorial Hospital*, 1:01-cr-238, was assigned to this Judge.

Mary: Yeah.

Mr. Faas: You read all that stuff and then I assume we need this resolution, is that the thing?

Diane: Correct.

Mr. Faas: Okay.

Mary: Recruitment, we were–

Mr. Faas: Just make that a motion, a second and an approval of that, of the financials and the physician compensation and the Corporate Compliance Program and recruitment.

(Dkt. No. 425, Ex. 20B at 46.)

Given the tacit nature of this approval, the Court must accept as true, for the purpose of this Motion, Plaintiff's contention that she did not explicitly second the motion. Nevertheless, the transcript provides certain evidence, consistent with Scott's admissions, that she made at least two very significant changes to the committee minutes which misrepresented what was said at the meeting and which, thereby, violated her protocol and her general corporate and officer duties.

**11. Administrative Leave**

Fraser and Valiant took their concerns about protocol violations to the Executive Committee on June 6, 2002. (Fraser Aff. (Ex. L), ¶ 23; Valiant Aff. (Ex. T), ¶ 29.) In Valiant's words, they recommended placement of Scott on paid administrative leave pending further investigation so that Scott would not be in a position to further interfere with Valiant's investigation. (Valiant Aff. (Ex. T), ¶ 29.) The Committee shared Fraser and Valiant's concerns and voted to place Scott on paid administrative leave effective June 12, 2002. (Fraser Aff. (Ex. L), ¶ 23.)

This law suit was filed on July 2, 2002.

22

Following Scott's placement on administrative leave, Plaintiff and Defendants' counsel engaged in some questions and answers regarding the location of the tapes and the alteration of the minutes.  In one of these exchanges, Plaintiff quoted a portion of what was said at the infamous meeting.  This caused Fraser to ask Plaintiff if she had the tapes.  Plaintiff then admitted that she possessed a single tape of the meeting, but refused to disclose it.  (Ex. K-8; Fraser Aff. (Ex. L), ¶¶ 21-22.)  It was not disclosed until Plaintiff's opposition brief filing on March 15, 2005, that Plaintiff, in fact, possessed all three tapes of the meeting.

### 12.  Fired

In September 2002, Fraser reported to Metropolitan's Board concerning Scott. (*Id.,* ¶ 29.) Though his investigation had confirmed that Scott should be terminated for the various employer concerns noted above, *id.,* ¶ 27 & Reply Mem., Ex. B at 3, Fraser recommended in September that Scott be continued on paid leave because of the pending compliance investigation and other sensitive Metropolitan business matters.  (Fraser Aff. (Ex. L), ¶ 29.)  In late Fall 2002, the Executive Committee asked Fraser to show Scott the door by way of a neutral administrative reorganization affecting her and Crowley and with an offered incentive of a severance package.  (*Id.,* ¶ 30.)  The severance package was offered (and refused) by Scott and she was terminated effective January 30 or 31, 2003.  (*Id.*)

### 13. History of "Protected Activities"

Against this background, there is the portrait that Scott has painted of herself as the corporate/FCA avenger.  To her credit, her personnel file *per se* was kept squeaky clean and free

from reprimands, discipline and the like.  (Pl.'s Ex. 42, personnel file).[18]  Scott claims in her Affidavit and briefing that she donned the robes of an FCA whistleblower beginning in June or July 2001, when she undertook her new assignments to improve Metropolitan's revenue/cash flow.  In that role, by Memorandum of June 26, 2001, she alerted Faas to financial areas of concern and requested additional access to financial systems.  (Pl.'s Ex. 20, Rule 26-05167.)

Examination of the documentation itself does not appear especially indicative of a report of fraudulent activity, though the agenda items are so vague that they could be construed in any number of ways.  The most damning reference is an isolated one to "Wound Clinic . . . Significant overbooking of unreimburseable charges." (*Id.,* Rule 26-05168.)  However, even that reference does not make clear whether those charges related to federal or state reimbursement as opposed to private insurance or private payer reimbursements, nor whether the concern was legal compliance or correct billings to insure profitability.[19]  There are other references in the memo regarding services which involved federal reimbursement and/or related to federal "related party" rules; however, those references are far from transparent.[20]  The reference to the Wound Clinic also did not solicit help from Faas and assigned this problem to "Finally assumed by Mary Scott." (*Id.*)

_____

[18]Though the Court will assume the best as to Plaintiff, in its experience, such clean files are common of upper management in many institutions– as to whom their only real score cards are the compensation paid them by their institutions, their involvement in law suits, and their longevity and/or history of promotion.

[19]According to Plaintiff's Response, at 11, the Wound Clinic involved federal reimbursement (as might be expected) and the Court also assumes based on counsel's statements, that some of the un-reimbursable charges were billed to Medicare or Medicaid.  What Faas knew about any of this is a complete mystery.

[20]Plaintiff explains her interpretation of the vague agenda items on pages 16 and 17 of her Response.

24

Nevertheless, Plaintiff, in her Affidavit in Rebuttal of Faas (Ex. 9, ¶¶ 29B-C), claims that she met with Faas once in June 2001, twice in July and once in August.  According to Plaintiff, she told Faas that the billing problems discussed in her general documents and agenda items constituted Medicare violations with which she was uncomfortable and needed assistance to fix.  (*Id.*)

On June 26, 2001, Scott sent another memo to Faas.  (Pl.'s Ex. 12.)  On the cover page, Scott warned Faas that "reimbursement . . .[was a] significant risk . . . [given that] the current staff are not appropriate for what we need . . . [T]he lack of ongoing analysis and . . accurate data generation is deeply disturbing."  (*Id.* at R26-00544.)  What follows is another vague "issues list."  (*Id.* at 2-9.[21]) The list itself presents as a series of opportunities for Metropolitan to correct its administrative and billing practices to collect more money, to document physicians' practices better to justify physician billings, and to generally fulfill better formal billing requirements necessary to bill either insurance companies or governmental payers.  (*Id.*)  As noted by Plaintiff's counsel, any number of these concern areas has a potential to generate false Medicare and Medicaid claims.  (*See* Resp. at 13.)

Plaintiff's counsel draws special attention to items 17-22 and 28.  (*Id.*)  Item 22 relates to ordering services not deemed "medically necessary" because staff has billed based on faulty patient information as opposed to accurate physician information. (Pl. Ex. 12 at 6.)  Item 28 relates to "patient no-show charges" and states "no-shows . . . often result in false charge[s] remaining in [the] system."  (*Id.* at 7.)  Items 17 includes mention of "Medicare outpatient code editor violations due to incorrect charging of pumps and monitors" as well as other "inappropriate[] charges."  (*Id.* at 5.) Items 18 to 21 involve governmental documentation and regulatory requirements.  (*Id.* at 5-6.)  Each

---

[21]This is the reference to the pages following the cover page, as to which, the documents are not legibly Bates-stamped.

of those items contains the caveat "If audited, potential for fees and penalties if no documentation found." (*Id.*)

However, the document that Scott champions is unusual.  It appears unedited (containing multiple grammar errors) and  incomplete–a working document that was not finished.  In particular, several sections discussing "recommendations" were left blank and the document has no conclusion language to signal its end.  (*Id.* at 2-9.)  Faas, for his part, claims that the document was never sent to him and any discussions of "revenue cycle" or meetings with Plaintiff at the time were about "revenue cycle" *simpliciter*.  (Faas Aff. (Ex. B), ¶¶ 49-50.)

As to the supposed subject matter of those meetings, Scott claims to have met with Faas to discuss the agenda items involving "illegal" billings and two sensitive matters which are not recorded in the Memo because they were "hot button" issues affecting a Board member.  (Scott Aff. in Rebuttal of Faas (Ex. 9), ¶ 29D.)  Those top secret areas were: (1) a lack of written orders, which is a documentation problem that can make billing illegal for Medicare purposes; and (2) the Vascular Studies arrangement Metropolitan had with two doctors (Drs. Sage and Rae), one of which, Dr. Sage, was a Board and Finance Committee Member.  (*Id.*)  Plaintiff does not say why the vascular billings were illegal in her brief, though it is known from the Government's Notice of Partial Intervention (Dkt. No. 25) that one Government theory was that the physicians were paid excessive compensation for interpreting vascular studies between 1995 and 2003 in violation of the Stark Law (42 U.S.C. § 1395nn).  (*Id.* at 2.)  Other theories of *qui tam* intervention are disclosed in the Notice, though the Government did not intervene as to all theories pled in the Complaint.  (*Id.*)  The *qui tam* aspect of the suit was eventually settled for a large multi-million dollar settlement, a large bounty for which

went to the Relator, Mary Scott.  (*See* Dkt. No. 56; *see also* 31 U.S.C. § 3730(d).)  The *qui tam* settlement order in question was entered on January 30, 2004.  (Dkt. No. 63.)

Plaintiff's testimony about her top secret, undocumented meetings with Faas relating to her unfinished memos is interesting for reasons other than its sheer unlikeliness (which is interesting enough).  Because the testimony presents for the first time specific testimony about prior meetings in a case in which neither discovery, deposition testimony or extensive prior court filings have previously disclosed these matters, caution must be had.  Plaintiff stated in a document filed on May 13, 2005 that Plaintiff's protected activity consisted of memorandums to Faas relating to Revenue Cycle.  (Dkt. No. 511 at 5.)  Indeed, Defendants took Plaintiff's deposition and specifically asked whether she had any meetings with Faas about vascular studies.  She said "she did not . . ."  (Scott Dep. at 523, Reply Mem., Ex. B.)  Regardless of the truth of such testimony, it is certain that her top secret meetings with Faas was not a topic at the Board Meeting which resulted in her termination since Board Members cannot foresee future events.

## STANDARDS FOR SUMMARY JUDGMENT

Defendants' Motion is brought pursuant to Federal Rule of Civil Procedure 56.  Under the language of Rule 56(c), summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  The initial burden is on the movant to specify the basis upon which summary judgment should be granted and to identify portions of the record which demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The burden then shifts to the non-movant to come forward with specific facts, supported by the evidence in the record, upon which a

27

reasonable jury could find there to be a genuine fact issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). If, after adequate time for discovery on material matters at issue, the non-movant fails to make a showing sufficient to establish the existence of a material disputed fact, summary judgment is appropriate.[22] *Celotex Corp.*, 477 U.S. at 323.

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions. *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552 (6th Cir. 2000) (quoting *Anderson*); *Fur v. Sch. Dist. of City of Hazel Park*, 364 F.3d 753, 759 (6th Cir. 2004); *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Celotex Corp.*, 477 U.S. at 323 (quoting *Anderson*, 477 U.S. at 255). The factual record presented must be interpreted in a light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Rule 56 limits the materials the Court may consider in deciding a motion under the rule: "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995) (quoting Federal Rule of Civil Procedure 56(c)). Moreover, affidavits must meet certain requirements:

> [A]ffidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

---

[22]The mountains of discovery and filings in this suit leave little doubt that discovery has been adequate. Furthermore, Plaintiff has not presented a proper Rule 56(f) affidavit so as to warrant a continuance of the proceedings pending a later summary judgment determination. Cac*evic v. City of Hazel Park,* 226 F.3d 483, 488 (6th Cir.2000); *Ironside v. Simi Valley Hosp.,* 188 F.3d 350, 354 (6th Cir.1999).

Fed. R. Civ. P. 56(e).  The Sixth Circuit has held "that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded." *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993); *Logan v. Denny's, Inc.*, 259 F.3d 558, 570 (6th Cir. 2001) (quoting *Moore*).  Thus, in resolving a Rule 56 motion, the Court should not consider unsworn or uncertified documents, *Id.*, unsworn statements, *Dole v. Elliot Travel & Tours, Inc.*, 942 F.2d 962, 968-69 (6th Cir. 1991), inadmissible expert testimony, *North Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1280 (6th Cir. 1997), or hearsay evidence, *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996); *Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994); *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003).

In the instant case, Plaintiff was warned by prior Order of this Court not to include matters prohibited under Rule 56(e)--hearsay statements, statements outside the affiant's personal knowledge, unattested documents and other matters not properly considered under the Rule.  (*See* Dkt. No. 497 at 3.)  Although Plaintiff has corrected many of its filings, some of its filings continue to violate the case law prohibiting the consideration of such evidence.  As to those matters, the Court has no choice but to exclude them from consideration under Rule 56.

Additionally, Plaintiff's newest testimony concerning the vascular studies and other disclosures in meetings with Michael Faas is not properly considered under Rule 56.  Under Sixth Circuit law, an affiant may not contradict previous deposition testimony to avoid the grant of summary judgment.  *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997); *Reid v. Sears, Roebuck & Co.,* 790 F.2d 453, 460 (6th Cir. 1986); *see also Ross v. Bigler*, 67 F.3d 1543, 1551 (10th Cir. 1995).  Application of this rule is especially proper in this context–where the proponent of the

evidence has a history of litigation shenanigans, including repeatedly hiding discoverable evidence.[23]

As such, the newly-minted evidence will be excluded from consideration.[24]

**LEGAL ANALYSIS**

**1. FCA Claims**

**a. FCA Standards**

Plaintiff has sued under Titled 31 United States Code section 3730(h).  The statute provides in pertinent part:

> **(h)** Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. . . . An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

31 U.S.C. § 3730.

Regarding a False Claims Act ("FCA") claim, the Sixth Circuit has said:

> In order to establish a claim for retaliatory discharge, a plaintiff must show: (1) he engaged in a protected activity; (2) his employer knew that he engaged in the protected activity; and (3) his employer discharged or otherwise discriminated against the employee as a result of the protected activity.

*Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003) (citing *McKenzie v. BellSouth Telecomm., Inc.,* 219 F.3d 508, 513-14 (6th Cir. 2000)).

---

[23]Sandbagging is inconsistent with a lawyer's ethical duties and the proper conduct of discovery and its function in the court system.  Moreover, the other reason for excluding such evidence is that it prevents the specter of perjury.

[24]While the Court so holds, for the record, even without such determination, this Court finds that Defendants would be entitled to summary judgment as to Plaintiff's federal claims.

Furthermore, this is the kind of claim which is subject to the burden-shifting analysis under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) and its progeny. *See, e.g., Norbeck v. Basin Elec. Power Co-op*, 215 F.3d 848, 849-50 (8th Cir. 2000); *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 n.4 (D.C. Cir. 1998) (citing Senate Report language).[25]

Regarding the "protected conduct" element of the tort, activity is protected if it has at its "nexus the 'in furtherance prong' of an FCA action." *McKenzie v. BellSouth Telecomm., Inc.*, 219 F.3d 508, 515 (6th Cir. 2000). The activity must "relate to 'exposing fraud' or 'involvement with a false claims disclosure.'" *Id.* at 516. Though formal words or knowledge of a *qui tam* action is not required, there must be some nexus with either a *qui tam* action or fraud action against the federal government. *Id.* Internal reporting may constitute "protected activity," but the report must itself allege fraud on the federal government. *Id.*

Furthermore, where the whistleblower is, as in this case, a corporate officer with assigned legal compliance responsibilities, the corporation must receive heightened notice that the employee intended to further a *qui tam*/FCA action rather than merely warning the defendant of the consequences of its conduct. *Yuhasz*, 341 F.3d at 567. The *Yuhasz* Court considered this question in detail and its words are worthy of notice:

> In [*United States ex rel.*] *Ramseyer [v. Century HealthCare Corp.]*, the Tenth Circuit dismissed a retaliatory discharge action brought pursuant to the FCA, noting that "the monitoring and reporting activities described in plaintiff's complaint were exactly those activities plaintiff was required to undertake in fulfillment of her job duties." 90 F.3d 1514[,] 1523 [(10th Cir. 1996)]. The court added that the plaintiff "took no steps to put defendants on notice ... that she was furthering or intending to further an FCA action rather than *merely warning the defendants of the consequences of their conduct*." *Id.* (emphasis added).

---

[25]Although the Court will employ the burden-shifting analysis, the Court also believes that summary judgment would be appropriate even in the absence of a burden-shifting analysis.

Similarly, the concerns about potential liability under the FCA raised by Yuhasz in this case were entirely within the scope of his duties, and thus did not put Brush on notice that he was engaging in protected activity.  The complaint describes Yuhasz's duties as follows:

[Brush] hired Yuhasz to design and establish, and then operate as a manager, a testing laboratory for its Lorain facility.... The laboratory was established to conduct certain chemical, mechanical and physical testing.  Yuhasz also established the specifications for the laboratory equipment.

* * *

Yuhasz conducted and or supervised testing procedures for [Brush's] Lorain facility.

* * *

On or about August, 1998, Yuhasz was appointed as the [Brush] employee charged with submitting the required certifications of compliance with the technical specifications of the alloys.

By informing Brush that its certifications were illegal and that other companies had incurred liability under the FCA for false claims, Yuhasz was simply performing his ordinary duties as a supervisor of laboratory testing.  Brush cannot be charged with notice on this basis.  *See Robertson v. Bell Helicopter Textron, Inc.,* 32 F.3d 948, 952 (5th Cir. 1994) (employer did not have notice where plaintiff's actions "were consistent with the performance of his duty"). The mere fact that Yuhasz told Brush that its certifications of compliance were "unlawful and illegal" does not establish notice.  As the Sixth Circuit noted in *McKenzie II,* "a plaintiff still must show that his employer was aware of his protected activity.  Merely grumbling to the employer about ... regulatory violations does not satisfy the requirement."  219 F.3d at 518 (quoting *United States ex rel. Yesudian v. Howard Univ.,* 153 F.3d 731, 743 (D.C. Cir.1998)).

Yuhasz argues that this interpretation of the notice requirement "grants immunity to an employer who terminates the employee most likely to have information relevant to a *qui tam* action."  This is not the case.  As the court noted in *Ramseyer,* employees charged with investigating potential fraud are not automatically precluded from bringing a Section 3730(h) action.  90 F.3d at 1523 n.7.  In light of their ordinary responsibilities, however, such persons "must make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations."  *Id.*

*Yuhasz*, 341 F.3d at 567-68.

Once "notice of protected activity" and the other elements of an FCA retaliation claim are

proven by a preponderance of the evidence, under the *McDonnell Douglas* burden-shifting analysis,

the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. Assuming that the employer does so, then the burden shifts back to the employee to show that the proffered reason was pretextual. *Id.* at 802.

Under Sixth Circuit law, pretext may be proven in one of three ways:

> To make a submissible case on the credibility of his employer's explanation, the plaintiff is "required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis *in fact,* (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge." *McNabola v. Chicago Transit Authority,* 10 F.3d 501, 513 (7th Cir.1993) (emphasis added and quotation marks omitted).

*Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994); *see also Smith v. Legget Wire Co*., 220 F.3d 752, 759 (6th Cir. 2000) (following *Manzer*).

Further, the Sixth Circuit has imposed an additional rule when the employee seeks to establish that the reason for discharge had no basis in fact. Under the Circuit's holdings in *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998) and *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116-17 (6th Cir. 2001), the employee must prove not only that the employer's justification was false, but also that the employer lacked "an honest belief" as to the truthfulness of the justification. Here are the Circuit's words:

> This Court has adopted an "honest belief" rule with regard to an employer's proffered reason for discharging an employee. *Smith v. Chrysler Corp.,* 155 F.3d 799, 806-07 (6th Cir. 1998). Under this rule, as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. *Id.* at 806. An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied "on the particularized facts that were before it at the time the decision was made." *Id.* at 807.

*Majewski*, 274 F.3d at 1117.

### b. Analysis of Scott's FCA Claim

As the above exposition makes plain, proof of an FCA claim is a somewhat daunting task. The record in Scott's case fails those standards utterly.

To begin, the memoranda that Scott allegedly sent in the Summer of 2001, similar to the notifications in *Yuhasz*, were insufficient to give Metropolitan notice of protected activity. Scott was at the highest echelons of corporate management with assigned responsibilities for billing, coding and legal compliance. In that light, her memoranda and her discussions with Faas consistent with the tone of her memoranda were insufficient to prove notice of protected activity.

It is clear that Scott did give adequate notice of false claims in April 2002. However, on Scott's own theory, Faas had already determined to terminate her before April 2002. Under these circumstances, Scott's theory of protected activity cannot succeed.

Furthermore, there is an even more basic causal problem for Scott's theory of liability. The causal chain between the "protected activity" and discharge was broken asunder when she brought her protected activity to the attention of Fraser in April 2002. This act saved her from termination by Faas and essentially gave her new supervisors–the Board and Fraser. Fraser made his later recommendations for Board action and the Board so acted not based on any protected conduct, which was explicitly not considered, but based on concerns about legitimate employee misconduct.[26]

---

[26]Plaintiff has made arguments that she was somehow wronged because Fraser did not pass on her arguments to the Board. There is no precedent or other legal support for this argument. Plaintiff was not a public employee with a right to a due process hearing. She was an officer serving at the will of her Board.

Assuming for the moment that Plaintiff could prove a *prima facie* case, summary judgment for Defendants is also warranted by the established record of employee misconduct.

In this case, Plaintiff has admitted facts which establish beyond any genuine issue of material fact that she wrongly altered corporate records and that she withheld from the corporation tapes evidencing corporate minutes. The withholding of the tapes was not "protected conduct" as argued by her counsel since she and her counsel were free to make arrangements with independent counsel for the safeguarding and/or copying of the tapes so as to protect her legitimate interests in the evidence. Moreover, the alteration of the corporate minutes was not only bad conduct, it was a crime under Michigan and common law.

Michigan law provides:

> An officer or agent of a corporation who knowingly falsifies or wrongfully alters the books, records, or accounts of a corporation is guilty of a misdemeanor and is subject to a fine of not to exceed $1,000.00 for each such offense.

Mich. Comp. Laws § 450.1932(2). *See also Peters v. Egnor*, 888 F.2d 713, 720 (10th Cir. 1989) (holding that falsification of corporate minutes was forgery under Colorado and British law); *United States v. Kenrick*, 221 F.3d 19, 30 (1st Cir. 2000) (upholding prosecution for alteration of corporate minutes).

Plaintiff's own admissions–that she altered the minutes to make them true in some sense to a prior meeting–does not establish even a legal defense to a criminal charge. Under Michigan law, proof that a criminal defendant acted knowingly is sufficient evidence to convict of a criminal offense requiring a *scienter* element of "knowing" conduct; the fact that a defendant may have been

motivated by an altruistic or pure motive is irrelevant. *See People v. Medlyn*, 544 N.W.2d 759, 761 (Mich. Ct. App. 1996); *People v. Harrell,* 221 N.W.2d 411, 416 (Mich. Ct. App. 1974).

Finally, forgetting for the minute the undisputed and indisputable evidence of wrongful workplace conduct, Plaintiff also fails to make a showing to establish that the reasons for termination were pretextual. In this case, the decision makers were the Board and Fraser, independent from Faas. There is no evidence raising a serious doubt that the Board lacked a "reasonable belief" as to the manifold reasons for discharging Plaintiff–*i.e.,* falsification of evidence, concealment of evidence, insubordination as to Fraser, refusal to obey the protocol, inappropriate conduct as to management assessment, verbal abuse of colleagues, efforts to manipulate management assessments, disparaging fellow officers, and threatening to retaliate against staff to name a few reasons. This is a mountain not a mole hill.

For each of these reasons, Defendants are entitled to summary judgment as to Plaintiff's FCA claims.

### 2. State Law Claims

What remains–claims for breach of contract and defamation--have been brought under state law and specifically pursuant to the Court's supplemental jurisdiction under 28 U.S.C. § 1367. (*See* Rev. Sec. Amend. Comp., ¶ 3.) This is significant since with the dismissal of the federal claims, the Court must determine whether or not to retain jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c)(3).

As specified in § 1367 and in the common law–cases such as *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966), even after federal claims are dismissed in suit, the federal court

retains subject matter jurisdiction over state law claims subject to its own judgment as to whether to exercise such jurisdiction.  While such is discretionary, the strong federal custom since *Gibbs* has been to dismiss those claims in order to permit state courts to decide their own law, as is their prerogative.

The history and operation of this statute was explained by the Sixth Circuit in *Musson Theatrical, Inc. v. Federal Exp. Corp*., 89 F.3d 1244, 1254 (6th Cir. 1996):

> However, there is a second problem with the district court's assertion of supplemental jurisdiction over the unpled state law claims.  On the particular facts of this case, it was an abuse of discretion to retain the state law claims on a theory of supplemental jurisdiction after dismissal of the federal claims upon which supplemental jurisdiction depended.
> *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S. Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) established the doctrine of supplemental jurisdiction as a matter of federal common law.  Essentially, *Gibbs* held that a federal court can decide a state law claim that forms part of the same "case or controversy" as a claim over which the court has jurisdiction.  *Ibid.*  Since *Gibbs,* federal courts have expanded and shaped the doctrine of supplemental jurisdiction by applying it to new circumstances.
>
> In 1990, Congress passed a supplemental jurisdiction statute, now codified at 28 U.S.C. § 1367.  Although § 1367 overruled *Finley v. United States,* 490 U.S. 545, 109 S. Ct. 2003, 104 L.Ed.2d 593 (1989) (restrictions on jurisdiction over third parties), the statute affirmed *Gibbs,* as interpreted by subsequent federal courts, as the proper measure of federal supplemental jurisdiction. . . .
>
> A district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims.  *Transcontinental Leasing, Inc. v. Michigan Nat'l Bank of Detroit,* 738 F.2d 163, 166 (6th Cir.1984).  That discretion, however, is bounded by constitutional and prudential limits on the use of federal judicial power.  *Gibbs* itself expressed one of the most important of these limits: "Certainly, if the federal claims are dismissed before trial, even though [the federal claims are] not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."  *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139.
>
> The word "certainly" was effectively erased by *Rosado v. Wyman,* 397 U.S. 397, 90 S. Ct. 1207, 25 L.Ed.2d 442 (1970).  There the Court held that a district court did not abuse its discretion in retaining jurisdiction over supplemental state law claims after it dismissed the

touchstone federal claim for mootness before trial.  397 U.S. at 405, 90 S. Ct. at 1214. *Rosado* held that there is no categorical rule that the pretrial dismissal of a federal claim bars a court from deciding remaining state law claims.  *Ibid.*  Instead, the decision depends on "judicial economy, convenience, fairness, and comity."  *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988).  This approach was codified at 28 U.S.C. § 1367(c)(3), which provides that a district court "may" (rather than must) decline to exercise jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction."

*Musson Theatrical, Inc.*, 89 F.3d at 1254.  Further, the *Musson* Court specified that when federal claims are dismissed as part of a Rule 12(b)(1) or 12(b)(6) motion, then the district courts should exercise their jurisdiction to dismiss the remaining state law claims except in certain narrow and limited "unusual circumstances."  *Id.*

In the instant case, the federal dismissal was not made as part of a 12(b)(1) or 12(b)(6) motion such that the Court retains its discretion as to whether the state law claims should be dismissed.  This is an unusual circumstance in that the state law claims have been long pending. Thus, the factor of judicial economy does favor their resolution by this Court.[27]  However, this is also a suit in which the parties are well represented and motivated to raise in fine detail the various aspects of state law presented in the breach of contract and defamation claims.  This means that the state law issues presented provide the state courts with a rare opportunity to define and clarify their own laws.  In other words, the interests of comity are especially strong in this case.  "Comity" as defined by *Black's Law Dictionary,* means the "courtesy among political entities . . . involving especially mutual recognition of legislative, executive and judicial acts."  *Black's Law Dictionary*

---

[27]The interests of fairness and convenience balance equally between the state and federal courts since state fora would provide an equally fair and convenient opportunity for the resolution of the state law claims.

at 261 (7th ed. 1990).  This courtesy must appreciate the state courts' primary role in adjudicating state law controversies and the federal courts' long term commitment to that project.

In this case, the process and role of comity has been delayed too long and should be made to work forthwith.[28]

Therefore, the state law breach of contract and defamation claims will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

**CONCLUSION**

For the reasons given, Defendants' Motion for Partial Summary Judgment will be granted in part and denied in part.  Summary Judgment shall enter as to the federal law claims and the state law claims shall be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

> The suit is o'er,
> Go on your way,
> Deeds reflected,
> In the light of day!

                                                           /s/ Richard Alan Enslen

DATED in Kalamazoo, MI:                RICHARD ALAN ENSLEN

      June 23, 2005                     UNITED STATES DISTRICT JUDGE

---

[28]Due to the late dismissal of the state law claims, the Court will, however, for the benefit of the state courts and for the purposes of further review, express its own opinion as to the state law claims (excepting the breach of contract/matching contribution claim).  The Court's opinion is that Defendants' partial summary judgment motion should be granted as to the state law issues by the state courts. For the purpose of appellate review, the Court also indicates that it concurs with Defendants' other arguments in their briefing to the extent that those matters were not specifically addressed herein.