UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,
*ex rel.* MARY SCOTT,

          Plaintiff,

Case No. 1:02-CV-485

v.

Hon. Richard Alan Enslen

METROPOLITAN HEALTH
CORPORATION d/b/a METROPOLITAN
HOSPITAL, a Michigan corporation, and
MICHAEL FAAS, an individual, jointly
and severally,

          Defendants.

**OPINION**

_____/

      This matter is before the Court on Defendants Metropolitan Health Corporation and Michael Faas'

Bill of Costs and Motion for Attorneys' Fees, Expenses, and Non-Taxed Costs as Sanction.  Both Plaintiff

Mary Scott and Defendants have fully briefed the pertinent issues and oral argument is unnecessary and

would only protract the resolution of the matters at issue.

      **BACKGROUND**

      Defendants' Motion is both typical and atypical.  The typical aspect is the Bill of Costs, which is

statutorily authorized under 28 U.S.C. § 1920 and is ordered as a matter of course.  The atypical aspect is

the request for sanctions and expenses under Federal Rules of Civil Procedure 26(g)(3), 37(c), 56(g) and the

Court's inherent authority (*see, e.g., Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991)) to sanction

litigation misconduct.

      This Court has already written at length concerning the background of this federal retaliation case.

The Court adopts by reference of its earlier Opinion, *United States ex rel. Scott v. Metropolitan Health*

*Corp.*, 375 F. Supp. 2d 626 (W.D. Mich. 2005), to provide a framework for this discussion.

As noted in the earlier decision, the federal retaliation claim was dismissed with prejudice on June 23, 2005.  This Motion was then filed in July 2005.  It was filed after Plaintiff appealed the underlying Judgment, though such appeal does not deprive this Court of jurisdiction to determine attorney fee and sanction motions, which are deemed collateral to the main cause of action and the appeal.  *See Buchanan v. Stanships, Inc.,* 485 U.S. 265, 267-68 (1988); *Budinich v. Becton Dickinson & Co.,* 486 U.S. 196, 202-03 (1988); *AAA Venetian Blind Sales, Inc. v. Beaulieu of Am., Inc.*, 1997 WL 476517, *4 (6th Cir. Aug. 19, 1997); *Reed v. Country Miss, Inc.,* 1995 WL 348041, *2 (6th Cir. June 8, 1995).

In this case, the request for costs is typical and is subject only to very particular objections, most of which are legal in nature.  Hence, those matters need little exposition here.

As for the other requests, they require exposition.  The sanction request depends on an analysis of Plaintiff and Plaintiff's counsel's litigation conduct, including discovery conduct.  The discussed misconduct concerns the concealment and non-disclosure of the complete February 7, 2002 Enterprises Board meeting recordings, in addition to some other taped recordings, and the making of perjurious and deliberately incomplete summary judgment affidavits.  The meeting recordings were an absolutely crucial piece of discovery because it showed that Plaintiff had altered the February 7, 2002 meeting minutes[1] to include matters not discussed in the meeting and to exclude other matters which were

---

[1]Plaintiff's briefing makes much of the fact that she altered the minutes before they could be approved by the Board, which incidentally never occurred because she also "mislaid" the tapes concerning the meeting and contested the minutes drafted by Diane Wiest (the person assigned the job of drafting the minutes by the Board).  Even assuming the "draft" minute argument, this does not make Plaintiff's conduct non-criminal.  Michigan law prohibits an officer from not only falsely altering minutes, but also falsifying them at all.  *See* Mich. Comp. Laws § 450.1932(2).  Though when Plaintiff was caught she could no longer succeed in her attempt to falsify the minutes, she was still guilty of attempted falsification, which under Michigan law is likewise punishable as a crime.  *See* Mich. Comp. Laws § 750.92.  Plaintiff's argument, thus, ignores the purpose of the criminal law which punishes offenders even if they are caught before the crime is consummated.  It also ignores that an employer, even apart from the expectations of

discussed in the meeting.  This fact doomed her retaliation claim because the alteration of the board minutes was a non-retaliatory reason given for Plaintiff's discharge, and, even if Defendants had decided for retaliatory reasons earlier to discharge her, they had protected her position as part of the investigation process until the alteration of minutes was discovered.

Let us review what has been told this Court about the February 7, 2002 Enterprise Board meeting and tapes, which has changed like the directions of a fickle wind.  On February 28, 2005, in connection with Plaintiff's Motion *in Limine*, Mary Scott filed an affidavit asserting that "My draft of the February 7 Board Minutes correctly reflected and was an accurate rendition of the events which occurred at that meeting . . . and was supported by the tape recorded record of the meeting."  (Dkt. No. 381, Ex. E (Scott Aff., Feb. 28, 2005) ¶ 2.)  This message was consistent with Plaintiff's counsel's briefings of the time.

On or about February 7, 2005,[2] Defendants filed their first Motion for Partial Summary Judgment regarding Plaintiff's retaliation claim.  The supporting Brief included reference to both a partial transcription of the February 7, 2002 Enterprise Board meeting provided to Defendants in discovery and a partial tape regarding the same, which was also previously provided to attorney Jeff Fraser.  (*See* Dkt. No. 347, Ex. V & Ex. M (Fraser Aff., Feb. 7, 2005) ¶ 26.)  The transcript was prepared by a certified court reporter, Ann L. Herman, based upon a cassette tape.  The transcript reflects one audiotape.  It was impossible to determine from either the audiotape or the transcript the

---

the criminal law, has a legitimate workplace expectation that such conduct not occur.

[2]The papers were submitted on February 7, 2005, but not formally filed until February 14, 2005, after the Court had approved a motion to exceed the page limitation.

accuracy of Mary Scott's minutes because neither the tape nor the transcript purported to be a complete

record of the February 7, 2002 meeting.

Plaintiff responded in opposition to the Motion.  The opposition was supported by Plaintiff

Mary Scott's Affidavit, which stated in pertinent part:

> I made the revisions of the minutes from memory of what occurred and asked for the tapes with
> the intention of listening to them at a later time . . . .  Although I knew the additional
> information I had included in the minutes was correct, I wanted to make sure that I had not left
> something out . . . .  Soon thereafter, within a week or so, I found one of the tapes, which much
> to my delight, contained a portion of the minutes at issue.  I then issued a supplemental
> explanation to [attorney] Fraser that was based on the tape.

(Dkt. No. 425, Ex. R-1N (Scott Aff. in Rebuttal of Wiest, Mar. 10, 2005) ¶ 11.)  In a separate affidavit

filed by Scott  concerning attorney Fraser's testimony, she again affirmed that "the revisions I made

to the minutes were accurate . . . ."  (Dkt. No. 425, Ex. R-1E (Scott. Aff. in Rebuttal of Fraser, Mar.

10, 2005) ¶ 12.)

Plaintiff's Response to the Motion also attached a much lengthier transcript.[3]  Plaintiff's

transcript was transcribed by Therese M. Headley and noted the use of three micro-cassettes.  (*See* Dkt.

No. 425, Ex. R-20A at 1; Ex. R-20B at 55 & 64.)  The transcript was longer than previous transcripts

and appeared to be a transcript of the entire meeting.  (*Id.*)  Neither the transcript nor the entire

recording upon which it was based were previously provided to Defendants in discovery.

Defendants' first Motion for Partial Summary Judgment was denied by Order of May 2, 2005

without prejudice.  At the time, the Court was not so concerned about the content of the tape or

transcript, but was concerned about Mary Scott's affidavits, which were replete with opinions which

---

[3]Those documents were first filed on March 14, 2005 as part a motion for leave to exceed
the page limitation.  After an order entered allowing the excessive pages, the documents were re-
filed the following day–the ides of March, which was fitting given the circumstances. (*See* Dkt.
Nos. 424 & 425.)

were outside her personal knowledge and, therefore, not proper evidence under Rule 56(e). (*See* Dkt. Nos. 497 & 499.) The Court also hoped that the re-filing of the motion would result in a more compact and readable record, though such was a vain hope. In the course of these events, though, Defendants' attorneys discovered the lengthier transcript, which was then significant to the later briefing.

On May 13, 2005, Defendants filed their Renewed Motion for Partial Summary Judgment.[4] (Dkt. Nos. 507 & 508.) Plaintiff's Affidavit in response to said Motion disclosed, when read in the context of complete transcript: (1) that she had originally produced a fragmentary tape of the February 7, 2002 meeting to Jeff Fraser, Dkt. No. 535, Ex. 9 (Mary Scott Aff., May 27, 2005) at 74-75 ¶ 11; (2) that after she produced the fragment she discovered the complete tape recordings of the meeting and

---

[4]Plaintiff suggests in the briefing that the Court's summary judgment ruling was mistaken because (1) she had a duty to "correct" the deficiencies in the minutes and (2) her firing was pre-ordained at the time of Bob Smedes' hiring. Neither conclusion is warranted by the record. Plaintiff's supposed "corrections" related to some other reality than what was said at the meeting. The purpose of the minutes, of course, was to document what was said at the meeting. As for Bob Smedes' hiring, the record shows that no termination was made until after and because of her undisputable misconduct in altering the minutes (at a time when she was being legally protected as part of an independent attorney investigation of her False Claims Act allegations). Plaintiff does make several other characterizations of the Court's prior Opinion which are simply false and a misreading of the Opinion. For example, Plaintiff suggests that the Court believed that "defense affidavits could not be false . . . ." (Dkt. No. 599 at 21-22 n.33.) This is far from the truth and a rather foolish accusation to make against an Article III judge that daily deciphers the standards under Rule 56. In deciphering those standings, the Court gives the non-movant every possible inference; however, when certain facts are not contested or uncontestable, they cannot be ignored under Rule 56. Likewise, references to Plaintiff's expert testimony concerning case studies about "group-think" in corporate organizations was inadmissible expert testimony which did not meet the requirements of Federal Rules of Evidence 702-04, *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and was the kind of testimony that was so general that it would not have assisted the jury in resolving the case. There are many other examples of misstatements in Plaintiff's Response, particularly sections 3A.5 and 6. Suffice it to say, the Court disagrees with those characterizations and relies upon its previous Opinion and the documents supporting it to refute them.

"[t]hat the tapes eventually showed up and had not been recycled was sheer luck[,]" *id.* at 75-76 ¶ 12; (3) that she had deleted from the minutes a statement made by Faas concerning attorney review of the physician model because she believed that the statement was historically inaccurate, even though it was actually made by him at the meeting, *id.* at 92-93 ¶ 12.J; (4) that she added to the minutes a statement by her requesting review of the model by counsel, though it had not been made at the meeting, *id.*; and (5) that during the meeting Diane Wiest was assigned the job of taking the minutes, *id.* at 92 ¶ 12.I.  The substance of Plaintiff's Affidavit, as well as the other record evidence, when read critically and with some commonsense understanding of litigation practices demonstrate that Plaintiff unlawfully retained the original three recordings (which were Defendants' property) and determined not to disclose them.  (*Compare* Dkt. No. 599, Ex. 8A–emails from attorney Lynn Hynds advising Plaintiff not to disclose a tape to Defendants[5] with Defs.' Ex. 510, L21, Rule 26-07237--Rule 26 disclosure stating that, according to Mary Scott, the non-disclosed 2/7/02 tapes were lost or recycled).

It is apparent from a review of the complete transcript why it was significant to have the complete[6] tape recordings and/or transcript in discovery.  Without them, Plaintiff would not have had

---

[5]The Court does believe that a whistleblower has a qualified privilege to retain certain workplace records to prove fraud under circumstances when the retention of the property constitutes "protected activity" under the statutory authorization to report and investigate wrongdoing.  *See* 31 U.S.C. § 3730(h).  However, this privilege must be exercised consistent with its limited purpose, the Congressional scheme, and consistent with the rights of the property owner (*i.e.,* by taking steps which both safeguard the property and do not deprive the property owner of all use, such as surrendering the property to an impartial custodian for agreed shared use).  Such a limited privilege is not a right to plunder and ambush.  Thus, even if counsel were advising Plaintiff not to disclose the 2/7/02 tapes, she had a legal and moral obligation to disclose the tapes (since they were Defendants' property) and, once the suit was filed and Rule 26(a) implicated, she had an obligation to disclose the content of all workplace recordings.

[6]No version of the tapes are 100 percent complete in that there are some breaks and inaudible portions in the recordings.  These portions are significant in assessing the use of the tapes for evidentiary purposes, but they are not significant when assessing the tapes for discovery purposes–as to which the tapes were crucial to an understanding of the amendment of the

to confront the unauthorized amendments to the Board Minutes which she made without company direction or approval, and which were frankly dishonest.[7]

On May 12, 2005, Defendants filed a Motion *in Limine* regarding Tape Recordings and Transcripts.  (*See* Dkt. Nos. 502, 503, 505 & 506.)  As part of the Motion *in Limine*, Defendants filed the fragmentary tape of the meeting which was produced for them in discovery.  (Dkt. No. 512, Ex. A, marked as MS-Rule 26-00680.)  The Court has listened to the tape and confirms Defendants' opinion that it did not contain significant materials contained in the previously filed transcript.[8] (*Compare* Dkt. No. 421, Ex. R-20A and R-20B–transcript.)  In particular, the Rule 26(a) tape provided in discovery only included the recorded portion of the meeting through page 43 of the transcript, *i.e.*, it ends abruptly in the middle of Faas' statements at the end of page 43 of the transcript and omits the balance of the second tape and the whole of the third tape.  The omission of these materials under Rule 26 is highly significant, notwithstanding that the concealment of the tapes, and the piecemeal disclosure of them made the evidence unreliable in some respects.  That is, the omission of these

---

minutes.

[7]Plaintiff has consistently claimed that she did so to incorporate by reference prior discussions not included in the meeting.  While it may have been important for other Board Members to have understood prior meeting dialogue, this could and should have been conveyed by making a record of the prior meetings as opposed to altering the record of the February 7, 2002 meeting to render it inaccurate. This is particularly so since both Scott and the Board had assigned to Wiest the job of making and keeping the minutes.  Additionally, the Court notes for the purpose of this record that it frankly disbelieves Plaintiff's account of the prior unrecorded meetings.  The timing of these events and Plaintiff's peculiar actions within the context of events, including losing and then finding the tapes, suggest that she was trying to make a false record concerning the matters reported upon for the purpose of buttressing her legal claims.

[8]The Rule 26 disclosure tape supplied to Defendants also differs in significant respects from the recordings filed by Plaintiff's counsel/Plaintiff's expert in connection with Plaintiff's Response to the *in limine* motion concerning the tapes.  (*Compare* Dkt. No. 533, Ex. 23C.)

disclosures (because they provided the most complete record of the meeting) delayed the eventual

admissions by Plaintiff which resulted, inevitably, in her loss of the case.

At this point, the Court must consider Plaintiff's most recent explanations of what occurred

in the context of discovery.  Plaintiff's counsel says:

> Plaintiff in fact produced copies of all three 2/7/02 taped recordings.  Defendants' claim that
> they only received partial copies of these tapes is incomprehensible and unbelievable, given
> that the claim flies in the face of all of the evidence relative to this matter, which was
> previously produced for the Court.

(Resp., Dkt. No. 599 at 8.)

Plaintiff's counsel, in making these statements, refers to the Affidavit of Amy Brown, a

paralegal in Plaintiff's firm.  Brown says that she received three micro-cassettes from someone in her

firm  (represented to be three micro-cassettes received from Mary Scott) and then submitted them to

John Ware of IKON (a cassette copying company) who then provided two copies, one of which was

provided to Defendants' counsel in July 2004.[9]  (Dkt. No. 599, Ex. 4 (Brown Aff.) ¶¶ 2-5.)

Interestingly, Brown does not say certain things which one would expect as part of such an affidavit.

She does not say that the tapes contained the contents of the full transcript.  She does not say that she

compared the three micro-cassettes to the copy which was sent to Defendants' counsel to confirm that

the total recordings were of the same length.  She also does not make any statement as to why the

"originals" were not returned, or otherwise shared or held in common, to prevent the kind of partial

disclosure which eventually occurred.[10]  Finally, she also does not offer any explanation as to why the

---

[9]The July timing is not explained and the previous Case Management Order had required
Rule 26(a) disclosures by April 26, 2004.  (Dkt. No. 144, ¶ 3.)

[10]Scott's deposition testimony about the production of the tapes (that she produced either
two or three tapes) is likewise less than lucid.  (Scott Dep., Dkt. No. 588 at 377.)  Given that the
tapes were so crucial to the case and given that she had not initially disclosed all of the tapes, her
testimony that she could not recall the number of tapes concerning the February 7, 2002 meeting

tape Defendants received is significantly different from the tape recording upon which the lengthy transcript was based.

What is more interesting than Plaintiff and Plaintiff's counsel's testimonials to their "honest" disclosures is the record of emails concerning the disclosure of all of the tapes in the case.  The extent of non-disclosure was always an issue in this case for at least three very significant reasons: first, Defendants needed a complete copy of the February 7, 2002 recording to understand the minutes controversy; second, Defendants long believed that Plaintiff had a box of secret and covertly-made tapes which were not disclosed, because Plaintiff showed Diane Wiest  "a baggie full of tapes that [Plaintiff] said she was 'taking to the bank,' . . . ."  between April 24, 2002 and May 21, 2002 (Wiest Aff., Feb. 7, 2005, ¶ 16); and third, given the disputed disclosure issues, Defendants needed to study all taped evidence for the purpose of assessing authenticity, accuracy and modifications.

The recent record of email correspondence filed by Plaintiff reveals that Plaintiff and her counsel kept from Defendants other copies of tapes after Defendants had requested the disclosure of all originals and copies.  On January 4, 2005, Scott sent an email to Amy Brown stating:

> If I come to your office this week could I look at the audio tapes that I have already turned over to you?
>
> I have a few other tapes but am still looking for one of them and want to see if I already have provided it to you.
>
> Could I stop in Thur. or Friday (I know that Monica will be in GR)?

(Dkt. No. 599, Ex. 7 at 9.)

---

is incredible and, in the Court's judgment, was designed to hide the non-disclosure of the complete recordings.  Additionally, the non-disclosure of the "original" version of the tapes was also significant because it prevented a defense expert from studying the tapes to determine whether the tapes which Plaintiff has represented as "originals" were in fact original recordings, as opposed to re-recordings which manipulated the inaudible portions.

9

On January 31, 2005, Plaintiff sent an email to Plaintiff's counsel, Monica Navarro, which email appears to reference the disclosure problem concerning the February 7, 2002 tapes and transcript:

> I went through the transcript that Amy sent me.  If this is her most complete version than I probably need to come to your offices and sit with her so we can listen to the tapes and fill in the blanks and names . . . .

(Dkt. No. 599, Ex. 7 at 11.)

On March 21, 2005, in the midst of the controversy concerning whether Plaintiff had disclosed all of the tape recordings, Monica Navarro sent the following email to Mary Scott:

> First, on the tapes, you were extensively deposed on whether there were other tapes and you said there were not.  So we need to deal with this issue one final time and never revisit it again because I don't want you to be accused of concealing evidence.  Here is what you need to do. Give me a narrative of what you found since your deposition that is not addressed in our reply brief by date of recording and a statement as to why you did not find it before, and all the "original" tapes (we can have them copied) . . . we have to make a supplemental document production.  I am not going to modify the reply brief because it will significantly weaken our position to state there are other tapes which we have not produced (even if we claim they are irrelevant).  My preference would be to deal with this after the Court rules, but we may not have that luxury . . . .

(Dkt. No. 599, Ex. 7 at 17.)

Plaintiff's Response alludes to the March 21, 2005 email and attempts to explain the matter as follows:

> On the morning of 3/21/05, as counsel was in the process of filing Plaintiff's Reply . . ., Plaintiff's counsel was advised by Mary Scott that she had just found a box with additional unclear or unmarked tapes in connection with moving her residence out of Grand Rapids, that she had not listened to the tapes to determine exactly what they were, and that some looked like they could be *originals* (as opposed to copies) . . . .  Having [previously] exhaustively reviewed with Plaintiff and other available sources the existence, availability, and status of all tapes . . ., Plaintiff's counsel concluded that these so-called *additional* tapes had to be nothing more than copies (or hopefully originals) of that which had already been produced . . . .  Accordingly, Plaintiff's counsel advised Plaintiff that it would not address the newly found tapes . . . in the . . . Reply, which had already been drafted . . . .

10

(Dkt. No. 599, at 12 n.19.)  The explanation then concludes by noting a May 13, 2005 email which documents that Plaintiff's counsel only found one additional tape to disclose, which was disclosed on May 13, 2005.  (*Id.*)

If the present case were a standard case about uncontested recordings made by an impartial recorder, then the attention to the various versions of tapes would seem overblown.  It is not, though. The present case is about secret and covert recordings made by an interested party, and involves a history of mishandling the evidence so as to make its authenticity and accuracy suspect.  Within this context, Defendants were entitled to examine every tape (even if they were mere copies, but especially if they were originals).  This is because a copy, by a slight variation in the recording, might show forensically how a copied tape had been modified, especially if there was a history of two or more re-recordings of the same tape.  Also, the sheer number of multiple recordings would be relevant to the issue of whether some suspect activity was afoot regarding the recordings.  If the tapes were original, then they would be even more crucial to an understanding of the authenticity and admissibility of both the originals and other copies.  Plaintiff's counsel should have been keen to these possibilities since they employed a sound expert in the case for the purpose of defending the authenticity of certain recordings and since they anticipated the filing of a motion *in limine* concerning the recordings even before such was filed.[11]

What is indubitable here is that it was incumbent upon Plaintiff and her counsel under Rule 26 to disclose complete copies of the three February 7, 2002 recordings and this was not done.  Why was it not timely done?  Amy Brown's Affidavit suggests that an attempt was made to disclose the

---

[11]Unlike the February 7, 2002 recordings, one cannot say that the non-disclosure of the additional tapes caused prejudice because their content is unknown.  However, it certainly provides some context for other non-disclosures made in the suit.

complete recordings.  Was the entire recording not produced because of innocent copying error?  This is unlikely for several reasons.  This was the one piece of evidence in this case which was too important to disclose without double and triple checking the accuracy of the disclosure.  Furthermore, the Court believes that it is standard practice for a credible tape copying company to compare the length of the "original" recordings to the copies to confirm that the recordings were the same length in minutes, *i.e.,* a significant difference in tape length would have been noticed.  Given the remote likelihood that the non-disclosure was not due to a simple copying error, and given the email correspondence which reveals that Plaintiff was involved in deliberate non-disclosure of additional tape recordings, the Court concludes that Plaintiff's non-disclosure of both the complete 2/7/02 recordings and the additional recordings was intentional, was motivated by a bad faith desire to conceal discovery materials, and had the effect of both delaying the resolution of the suit and forcing Defendants to pay avoidable legal expenses.

Additionally, the Court also concludes that the early summary judgment affidavits filed by Mary Scott were intentionally false, omitted significant information known to her (*i.e.,* that she had made revisions to the minutes not based upon what was said at the meeting), and were filed in bad faith to the prejudice of Defendants.

### LEGAL STANDARDS

Costs are governed by 28 U.S.C. § 1920, which provides:

A judge or clerk of any court of the United States may tax as costs the following:

**(1)** Fees of the clerk and marshal;

**(2)** Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

**(3)** Fees and disbursements for printing and witnesses;

12

**(4)** Fees for exemplification and copies of papers necessarily obtained for use in the case;

**(5)** Docket fees under section 1923 of this title;

**(6)** Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

28 U.S.C. § 1920.

Regarding sanctions, there are not one, but several, standards pertinent to discovery disclosure and litigation conduct. First there are the discovery requirements of Rule 26. Rule 26 is about disclosure and, since the 1993 amendments, mandates disclosure, without a request, within 14 days after the Rule 16(f) conference or such other time as the court may order. Rule 26(a) provides in pertinent part:

**(a) Required Disclosures; Methods to Discover Additional Matter.**

**(1) Initial Disclosures.** Except in categories of proceedings specified in Rule 26(a)(1)(E), or to the extent otherwise stipulated or directed by order, a party must, without awaiting a discovery request, provide to other parties:

**. . . .**

**(B)** a copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment;. . .

These disclosures must be made at or within 14 days after the Rule 26(f) conference unless a different time is set by stipulation or court order . . . .

Fed. R. Civ. P. 26(a).

Once discovery is disclosed, Rule 26(e) requires that it be properly supplemented:

**(e) Supplementation of Disclosures and Responses.** A party who has made a disclosure under subdivision (a) or responded to a request for discovery with a disclosure or response is

under a duty to supplement or correct the disclosure or response to include information thereafter acquired if ordered by the court or in the following circumstances:

**(1)** A party is under a duty to supplement at appropriate intervals its disclosures under subdivision (a) if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. . . . .

**(2)** A party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Fed. R. Civ. P. 26(e).  Rule 26(e) is policed by Rule 37(c)(1), which authorizes sanctions for failure to supplement discovery disclosures as well as other Rule 26(a) violations.

When discovery is not made in compliance with Rule 26, Rule 26(g)(3) authorizes sanctions under certain conditions:

**(g) Signing of Disclosures, Discovery Requests, Responses, and Objections**.

**(1)** Every disclosure made pursuant to subdivision (a)(1) or subdivision (a)(3) shall be signed by at least one attorney of record in the attorney's individual name, whose address shall be stated. An unrepresented party shall sign the disclosure and state the party's address. The signature of the attorney or party constitutes a certification that to the best of the signer's knowledge, information, and belief, formed after a reasonable inquiry, the disclosure is complete and correct as of the time it is made.

**(2)** Every discovery request, response, or objection made by a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, whose address shall be stated. . . .  The signature of the attorney or party constitutes a certification that to the best of the signer's knowledge, information, and belief, formed after a reasonable inquiry, the request, response, or objection is:

**(A)** consistent with these rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law;

**(B)** not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and

**(C)** not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation. . . .

**(3)** If without substantial justification a certification is made in violation of the rule, the court, upon motion or upon its own initiative, shall impose upon the person who made the certification, the party on whose behalf the disclosure, request, response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee.

Fed. R. Civ. P. 26(g).

Rule 56(g) authorizes sanctions for a separate problem–an intentionally false or misleading affidavit which was filed in bad faith or for delay in the context of summary judgment filings.  The Rule provides:

**(g) Affidavits Made in Bad Faith.**

Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

Fed. R. Civ. P. 56(g).

## LEGAL ANALYSIS

### 1. Costs

Costs are sought by Defendants, initially, in the amount of $25,425.54.  This is itemized as $12,569.03 for transcript fees (28 U.S.C. § 1920(2)); $1,265.71 for witness attendance, mileage and

like fees (28 U.S.C. §§ 1920(3) & 1821); $5,030.60 for copying fees (28 U.S.C. § 1920(4)); $145.00 for docket fees (28 U.S.C. §§ 1920(5) & 1923); and $6,415.20 for other expenses. These items are supported by a proper declaration, under 28 U.S.C. § 1924, that the costs were actually and necessarily incurred in the action. In later briefing, though, Defendants concede that one post-judgment invoice of Patricia Igoe (for $275) should not be paid, making the total for other costs $6,140.20, and all costs sought $25,150.54.

As to the assessing of costs, the Sixth Circuit Court of Appeals has said:

The types of costs that may be assessed against the losing party are enumerated in 28 U.S.C. § 1920, and include fees for court reporters, witnesses, and photocopying. This Court has held that the language of Rule 54(d) "creates a presumption in favor of awarding costs, but allows denial of costs at the discretion of the trial court." *White & White, Inc. v. American Hosp. Supply Corp.,* 786 F.2d 728, 730 (6th Cir. 1986). Because Rule 54(d) establishes a norm of action entitling the prevailing party to its costs as of course, a district court's discretion to depart from the rule and deny costs is more limited than it would be if the rule were "nondirective." *Id.* at 731-32.

Among the factors the district court may properly consider in denying costs to a prevailing party are whether the prevailing parties taxable expenditures are unnecessary or unreasonably large, *Goostree v. State of Tennessee,* 796 F.2d 854, 864 (6th Cir. 1986), *cert. denied,* 480 U.S. 918 (1987); and the losing party's inability to pay, *Congregation of the Passion v. Touche Ross & Co.,* 854 F.2d 219, 222 (7th Cir. 1988).

*Texler v. County of Summit Bd. of Mental Retardation & Developmental Disabilities,* 1994 WL 252938, **9 (6th Cir. June 8, 1994).

Plaintiff has made particular objections. First, she objects that the deposition and transcript fees were insufficiently documented. The Court has reviewed the Appendix to the Bill of Costs, which set forth the date, deponent and charge of each of the depositions billed. The Court can discern from its prior review of the record that the deposition transcripts at issue were necessary to the case. The charges listed appear consistent with the standard rates and practices for court reporters in the Western

District of Michigan and are otherwise reasonable charges which should be reimbursed. Thus, there is no basis for the objection.

Plaintiff's second objection is to providing reimbursement for witness fees, mileage and lodging expenses, which Plaintiff believes either were not paid or were not sufficiently documented. However, it is reasonably clear from the documentation provided, which lists the witnesses' addresses, the appearance fees (for record deposition testimony), the mileage and related charges billed under 28 U.S.C. § 1821, that those charges are consistent with the statutory limitations and were sufficiently documented with one exception.

The following quotation explains the pertinent law:

> In interpreting Section 1821, courts consistently have held that parties are not entitled to witness fees for their own appearances in court. *See, e.g., Green Const. Co. v. Kansas Power & Light Co.,* 153 F.R.D. 670, 678-79 (D. Kan. 1994); *Ingersoll Milling Machine Co. v. Otis Elevator Co.,* 89 F.R.D. 433, 435 (N.D. Ill. 1981). Equally consistently, however, courts have held that costs may be assessed for corporate officers and directors not personally involved in the litigation who testify on behalf of the corporation. *See Green Const. Co.,* 1994 WL 76612 at *6 . . . . ; *Ingersoll,* 89 F.R.D. at 435; *see also* 10 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2678, at 376.

*WH Smith Hotel Servs., Inc. v. Wendy's Intern., Inc.*, 25 F.3d 422, 429-30 (7th Cir. 1994); *see also Kemart Corp. v. Printing Arts Research Labs., Inc.,* 232 F.2d 897, 901-02 (9th Cir. 1956) (stating same rule and citing cases); *Hill v. Gonzalez*, 53 F.R.D. 1, 3 (D. Minn. 1971) (stating that a prevailing party may tax an expert witness fee to the extent of the section 1821 allowance).

In the present case, all of the witness fees under 28 U.S.C. § 1821 related to corporate employees, corporate officers, or persons who were under service contracts with Defendants (*i.e.*, attorneys, contractors and expert witnesses). Each of those persons were doubtlessly compensated at rates exceeding $40 per day for the time spent (and the other calculations of mileage, travel and

17

lodging appear otherwise accurate).  The one exception is Michael Faas who, because he was a party, does not fall within the rule of section 1821 for witness reimbursement.  As such, the objection is granted to the limited extent that the Court will reduce the amount billed by $43.94 to eliminate compensation for Faas.

Plaintiff's third objection asks for something patently unreasonable.  Plaintiff asks that Defendants' copying expenses be disallowed for not documenting the purpose and number of the multiples copies referenced, *i.e.*, the bill lists the items copied and the total pages, but not the total numbers of copies (which could be determined by comparing the original to the number of copies, assuming no wasted copies).  This request is unreasonable to the extent that it asks for a more detailed documentation since the bill and appendix are specific enough to document the expenses. The copying at issue has been done in a document intensive case in which the Court and the Clerk's office is literally filled with the many boxes of copies filed, including many sealed copies (which are not filed *via* the ECF system).  These documents were not merely convenient, they were a necessity to any proper adjudication of this case, particularly since the contentiousness of this litigation turned every paper filed into a contest of blows and particularly since the Court has limited resources.  Moreover, to require more specific justification of multiple copies in a case in which thousands of such copies were necessary would thwart Congress' intended award of such copying fees.  The objection is denied.

Plaintiff's fourth objection concerns the allowance of computer aided research fees, *i.e.*, Westlaw service charges.  Plaintiff has a point to the objection because even those decisions which permit electronic research charges do so as an element of "attorney fees" as opposed to an element of "costs." *See, e.g., Leftwich v. Harris-Stowe State College*, 762 F.2d 686, 695 (8th Cir. 1983); *Cont'l Ill. Sec. Litig. v. Cont'l Ill. Corp.*, 962 F.2d 566, 570 (7th Cir. 1992); *Case v. Johnson County, Kan.*,

157 F.3d 1243, 1258 (10th Cir. 1998).   Therefore, the objection will be granted as to "costs."
However, this denial is "without prejudice" and Defendants may renew the requests in the context of
future briefing as to the amount of reasonably and necessarily incurred attorney fees.   The same
holding applies to Defendants' electronic exhibit expenses, which was reasonably and necessarily
incurred and in the character of a reasonable attorney expense, but is not a statutorily authorized cost.

Therefore, costs are allowed in the total amount of $18,966.40.

### 2. Sanctions

Sanctions are not a pleasing subject to either parties, attorneys or the courts which must enforce
them.   This Court is always reluctant to impose sanctions, both against parties, who are typically
inexperienced and without legal expertise, and against attorneys, who generally speaking are trying
to earn a living in the difficult win or loss arena of federal litigation.

Notwithstanding this Court's reluctance, Rules 26(g) and 56(g) now mandate sanctions for bad
faith violations of the Rules.   "Sanctions under Rule 26(g)(3) are not discretionary if the district court
finds that a discovery filing was signed in violation of the rule."   *McHugh v. Olympia Entm't, Inc.*, 37
Fed. Appx. 730, 741 (6th Cir. May 28, 2002).   Rule 26(1) imposes a duty of reasonable inquiry as to
the completeness of a discovery disclosure.

In this case, disclosure duty related to the recordings of the February 7, 2002 meeting, which
was the most important piece of evidence in this case.   The disclosure was not complete and there was
no substantial justification for its incompleteness.   Indeed, it appears that the non-disclosure was either
intentional or, at the least, the product of a complete failure to make any "reasonable inquiry" into the
completeness of the disclosure.   As stated above, the Court concludes that the non-disclosure was done

19

intentionally and in bad faith.  The Court also concludes that it was due primarily to Plaintiff (who initially secreted the tapes and then retained them until later disclosed).  Given the bad faith nature of the delayed disclosure and the prejudice cased by it, a significant financial sanction is justified. Plaintiff will be required to pay the costs incurred because of the violation, including a reasonable attorney fee caused by the non-disclosure.[12]  *See also Dugan v. Smerwick Sewerage Co.,* 142 F.3d 398, 407-08 (7th Cir. 1998); *Salgado by Salgado v. Gen. Motors Corp.,* 150 F.3d 735, 739-40 (7th Cir. 1998).

This result, which is dictated by the terms of Rule 26(g), is also consistent with case law. Another similar case is *Deese v. Springfield Thoracic & Cariovascular Surgeons*, 183 F.R.D. 534, 536-37 (C.D. Ill. 1998), which imposed Rule 26(g) sanctions for the failure to disclose an audio tape and transcript of the tape.  The non-disclosure in *Deese*, as in this case, was a matter the offending party had planned for the purpose of surprise.  In this case, the matter not disclosed was far more important to the case.  Also, the consequences of non-disclosure were far graver than in *Deese* and much more than the $1,000 sanction imposed in *Deese* is warranted in the present case.

Rule 56(g) provides a mechanism for the imposition of sanctions for "bad faith" affidavits filed as part of the summary judgment practice of the federal courts.  "Bad faith" under the Rule includes the making of affidavits containing perjurious or blatantly false allegations or omitted facts concerning

---

[12]Rule 26(g)(3) authorizes the sanction to be imposed against either or both the offending attorney or party.   The Court will leave for later briefing the amount of such sanction.  The Court will impose this liability only upon Plaintiff, and not against Plaintiff's counsel, because the history of this suit and the many exhibits show rather clearly that Plaintiff, much more so than her lawyers, was the driving force behind the various disclosure problems.  The Rule 26(g)(3) liability will begin as of the date of the Order denying Defendants' first summary judgment motion (May 2, 2005), on the theory that complete disclosure would have avoided the remainder of the suit since summary judgment would have been granted earlier.

issues central to the resolution of the case. *Jaisan, Inc. v. Sullivan*, 178 F.R.D. 412, 415 -16 (S.D.N.Y. 1998); *see also Sutton v. U.S. Small Bus. Admin.*, 92 Fed. Appx. 112, 118 (6th Cir. Dec. 4, 2003) (citing *Jaisan* with approval); *SMS Assocs. v. Clay*, 868 F. Supp. 337 (D. D.C. 1994) (affirming sanction).

Although it is a rare case which qualifies for a sanction under Rule 56(g), the present one qualifies. Plaintiff made intentionally false and misleading statements in her affidavits filed in connection with Defendants' first summary judgment motion, which had the effect of delaying the grant of summary judgment for several months. As such, Plaintiff Mary Scott (the party employing the bad faith affidavits) shall be required to pay the costs incurred by Defendants, including attorney fees, from time of the denial of the first summary judgment motion (May 2, 2005) until the entry of judgment (June 23, 2005).

Additionally, as noted in the briefing, the federal courts have inherent authority to impose sanctions on a party and attorney for bad faith conduct during the course of litigation. *See Chambers,* 501 U.S. at 43-50; *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 765-66 (1980); *Ray A. Scharer & Co. v. Plabell Rubber Prods., Inc.,* 858 F.2d 317, 320-21 (6th Cir. 1988); *Shimman v. Int'l Union of Operating Eng'rs, Local 18,* 744 F.2d 1226, 1230 (6th Cir. 1984) (en banc). The "bad faith" conduct described on this record justifies not only an award of the sanctions described above, but an award for theIR attorney fees and costs incurred by Defendants in this litigation.[13]

---

[13]Since it has not been shown that the original *qui tam* allegations (which were dismissed voluntarily) were frivolous, the Court will not require Plaintiff to pay for the defense of those allegations. Therefore, for the period of July 2, 2002 through January 30, 2004 (dismissal of *qui tam* allegations), Plaintiff's liability is limited to the services expended in defending the employment claims only. After January 30, 2004, Plaintiff shall have full liability for Defendants' fees and expenses until dismissal of the action because the action at that time related solely to Plaintiff's employment/retaliation claims.

Plaintiff's conduct in the filing of the suit, when she knew that she had without authority modified the Board minutes to make them inaccurate by including statements not made at the meeting and deleting statements made at the meeting, means that the filing of the suit was not objectively reasonable and was done in bad faith.  This is particularly so because the bad faith conduct caused Defendants prejudice and necessitated Defendants' defense of a massive and costly but legally baseless suit.  This finding thus justifies the liability imposed above and additionally costs and attorney fees incurred by Defendants from the time of the filing of the suit until the entry of judgment as specified above.  The amount of those costs and attorney fees will be determined as a result of additional briefing.[14]  *See also Kinnear-Weed Corp. v. Humble Oil & Ref. Co.*, 441 F.2d 631, 636-37 (5th Cir. 1971).

While saying so, the Court acknowledges that this ruling works contrary to the American rule that parties pay their own attorney fees and expenses.  In making the ruling, the Court has duly considered the complexity of the case, the public's interests in reporting false claims against the Government, and that the fees will be paid by an affluent, but unemployed, ex-executive. Notwithstanding such concerns, this record demands the sanctions.  This record shows why large but frivolous cases impose enormous costs, both on society and the courts.  Unless those responsible  are held to account, their folly will be repeated and we will all be the poorer.

---

[14]It is obvious that the sanction awards overlap.  The Court does not intend to reimburse the same expenses multiple times, but does intend to provide multiple rationales for the award of the expenses incurred in this suit.

## **CONCLUSION**

For the reasons given, an Order shall enter approving costs in the amount of $18,966.40, approving liability as to Defendants' attorneys fees and expenses, and requiring further briefing as to the amount of those fees and expenses.

                                              /s/ Richard Alan Enslen

DATED in Kalamazoo, MI:              RICHARD ALAN ENSLEN
         September 29, 2005              SENIOR UNITED STATES DISTRICT JUDGE

23