UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA
*ex rel.* MARY SCOTT,

         Plaintiff,

v.

METROPOLITAN HEALTH
CORPORATION d/b/a
METROPOLITAN HOSPITAL,
and MICHAEL FAAS,

         Defendants.
_____/

Case No. 1:02-CV-485

Hon. Richard Alan Enslen

**OPINION**

      This is the fag end of a long and bitter suit. What is left is to exact a measure of justice according to what has come before.

      **BACKGROUND**

      To summarize, this suit started as a presumptively legitimate *qui tam* suit under the False Claims Act. The *qui tam* portion of the suit was dismissed as part of a Settlement Agreement. Under such Agreement, Plaintiff received an 18-percent cut of the structured settlement, of which $777,058.64 has previously been paid Plaintiff, and $426,470.52 remains outstanding.[1] (Settlement Agreement, App. A.) These amounts represent a total of the 18-percent portions of Metropolitan Health Corporation's initial payment of $1 million dollars and 12 quarterly payments of $473,856.14

_____

[1]Plaintiff has indicated that her net recovery will be less due to taxes. While this may be true, it is quite beside the point.

to the United States of America (of which five such payments remain).[2]  The United States, under

the *qui tam* Settlement Agreement, is required to transmit 18-percent of each payment electronically

to Plaintiff upon receipt from Metropolitan Health Corporation.  (Settlement Agreement ¶ III.1.d.)

Of course, this suit did not end with the settlement of the *qui tam* claims.  Plaintiff continued

the suit to press an illegitimate 10-million dollar claim, one she knew to be false–that she was fired

in retaliation.[3]  She knew the claim to be false because, for among other reasons, she knew that she

had attempted to falsely alter corporate minutes (the February 7, 2002 Enterprise Board meeting

minutes), which was a legitimate reason to fire her and one of the most significant reasons given by

the attorneys who recommended her termination to the Board of Directors.  She also knew or should

have known that her conduct as to the minute tapes and minutes was important to the Board's

decision because she was suspended after Metropolitan's attorneys learned of the attempted

alterations, because she and her lawyers were questioned about the attempted alterations of the

minutes and the whereabouts of the tapes during her suspension, and because her termination

followed after the investigation of the minutes alterations.  (*See* Dkt. No. 133, 6-7.)  She also knew

this during the early part of the suit because of court filings and discussions among counsel.  (*See*

*id.* and Defs.' Reply Br., 12  n.9.)

---

[2]The December 5, 2005 payment was just made, but by separate Order of this Court was
deposited into the Court's registry for distribution as determined by later order.  This was
pursuant to the Court's equitable jurisdiction to prevent irreparable harm (*i.e.,* the secreting of the
monies beyond collection) and its continuing jurisdiction over the *qui tam* settlement.

[3]Because of the truly extensive nature of the prior proceedings, the Court includes by
reference its prior Opinions of June 23, 2005 (summary judgment Opinion) and September 29,
2005 (sanctions liability and costs Opinion).

2

As noted in the prior Opinions, the substance of Scott's misconduct was eventually documented beyond dispute in the litigation of this suit (because a complete transcript of Board minutes was eventually disclosed by Plaintiff's counsel for the purpose of making some points in briefing), but not before Defendants spent very substantial resources to flush out the truth from Scott (while also spending substantial resources countering many other factual contentions by Scott concerning her workplace conduct and otherwise defending the suit). In the course of the suit, Scott filed false affidavits and failed to disclose crucial evidence (the complete tapes of the Board meeting) as well as other taped recordings of covertly recorded conversations. The non-disclosure of the minutes tapes has now been admitted by Scott, though blamed upon a paralegal who has no detailed explanation for making the critical "mistake"[4] of not disclosing the complete recordings.[5]

Plaintiff's conduct throughout the suit has been to deny secret wrongdoing, until confronted with undeniable evidence of it. In a word, she has not displayed any semblance of self-responsibility or remorse concerning either her wrongful workplace conduct or her wrongful litigation conduct which concealed her wrongful workplace conduct. Leniency in sanction is not advised by the conduct of Mary Scott nor the precepts of justice.

---

[4]The Court does not believe this convenient and unsubstantiated scapegoating of the paralegal when the non-disclosure happened in the context of a suit in which Scott had deliberately concealed other evidence and filed deliberately false affidavits. However, even if the Executive Minutes tapes were not disclosed due to accident of the paralegal, this hardly excuses Scott, who had ample reason to know of the non-disclosure throughout the suit.

[5]*See* Notice of Withdrawal (Dkt. No. 634) and Order withdrawing Motion for Reconsideration (Dkt. No. 640).

In light of such, the Court determined by Opinion and Order of September 29, 2005 that Plaintiff Mary Scott was liable for Defendants' attorney fees and expenses[6] under both court rule and the Court's inherent authority to sanction wrongful and bad faith litigation conduct. The determination of attorney fees expressly excluded fees incurred by Defendants in defending the *qui tam* portion of the suit, which was not frivolously maintained. Since the determination of liability, Defendants has moved for an award of attorney fees and expenses in the amount of $1,609,713.80.[7] This figure is substantially less than the services actually performed since counsel initially discounted their billings to Defendants by some $141,197.86. (*See* Defs.' Br. in Supp., Ex. B & B-1.) This amount is also actually much less than the amounts which were billed Defendants for defending the retaliation suit. Due to a strategic decision to keep certain time records privileged pending appeal, Defendants have not sought reimbursement of over $227,000.00 of fees and costs which were actually billed Defendants for legal work and costs in the litigation. (*Id.* & Defs.' Ex. C & C-1.) Finally, to avoid challenge and facilitate a decision on the attorney fees motion, Defendants have also waived an additional claim for $65,959.07 of attorney fees actually billed Defendants. (*See supra* n.7.)

------------------------

[6]The same Order established Defendants' right to $18,966.40 in statutory costs, which issue, having been previously decided, is not presently before the Court.

[7]Defendants' initial Motion requested even more fees, $1,675,672.87 (Dfs.' Br. in Supp. 14), but was then reduced with the filing of Defendants' Reply Brief (Defs.' Reply Br. 13.) This requested amount does not include statutory costs which were previously awarded. (*Id.*) The reason for the reduction is that Defendants have determined, to save both their own resources and court resources, to avoid a line-by-line fight over which entries in Plaintiff's Response, Exhibit A are properly regarded as related to the retaliation case (compensable) versus related to the *qui tam* suit (non-compensable). (*See* Defs.' Reply Br. 1.) This accounts for the $65,959.07 difference. (*See id.*) Most of this difference relates to hours billed by the Rhoads McKee law firm, though 14.9 hours of the billings were billed by the Epstein Becker law firm. (*See* Pl.'s Resp., Ex. A.)

4

Defendants' Motion is supported by a fat book of exhibits and affidavits, which document the hours spent by Defendants' attorneys and that such hours and bills of service were actually, reasonably and necessarily incurred in the litigation. *See* 28 U.S.C. § 1924. Defendants' Motion also documents that the rates were the product of a freely negotiated attorney fee agreement and that Defendants have in fact paid the hours of service for which they seek reimbursement. (Defs.' Br. in Supp. 2, 7 & Ex. D.) Because attorney Jeff Fraser (Defendants' usual counsel) was destined to be a witness in this case, he and his law firm (Varnum Riddering Schmidt & Howlett) did not act as litigation counsel in this suit. That job was left to the able hands of Bruce Neckers and other partners, associates and legal assistants of Rhoades McKee P.C.

Attorney Bruce Neckers is a past president of both the Grand Rapids Bar Association, the Western District of Michigan Federal Bar Association and the Michigan Bar Association. He has a well-earned reputation as a fine trial advocate and has participated in many federal actions before this District. Other attorneys defending the file were: Mary Ann Cartwright (a senior employment law specialist); John Lichtenberg (litigation partner, admitted in 1980); Mary Tabin (admitted in 1998); Anthony Pearson (admitted in 1998); LaRissa Hollingsworth (admitted in 2003); and Matthew Van Dyke (admitted in 2004). These attorneys billed at their customary rates, which rates[8] are consistent with the prevailing local market rates considering the attorneys' experience and

---

[8]The Rhoades McKee blending rate for all attorneys was $188/hour. The blended rate combines the attorneys individual rates which vary from a high for Bruce Neckers of $300/hour to a low of $150/hour for Matthew Van Dyke. (Defs.' Br. in Supp., Ex. B, B-2 & B-3.) Defendants also billed services for clerks and legal assistants ($90/hour for clerks and $90/$100 hour for legal assistants with the exception of paralegal time for Mr. Clifford which was billed at a higher rate due to his tax expertise). The Court finds that all such rates were reasonable and consistent with market rates in the community. The Court also finds that the use of paralegals and clerks to perform research and administrative functions was an efficient and cost effective use of resources which should be compensated.

expertise. (*See* Defs.' Br. in Supp., Ex. E-1 & E-2 (market rate surveys).) Defendants also judiciously used the services of both law clerks and legal assistants and billed those services according to those persons' customary hourly rates, which rates are consistent with the local market rates for law clerks and paralegals. This large defense team was required because of the size of the suit (10 million dollars) and the factual and legal complexity of the claims and defenses.

Defendants have also sought reimbursement as part of the totals discussed above some $95,126.82 of fees for attorney services of the law firm--Epstein Becker & Green, P.C. (less the hours Defendants have conceded in reply, *see supra* n.4). (Defs.' Br. in Supp., Ex C & C-1.) As noted, this amount has been discounted from Defendants' actual paid attorney fees incurred in connection with the retaliation case. (*See id.*) The Epstein Becker billings each related to the retaliation case.

The blended rate for these fees is much higher–$324/hour[9]--because these attorneys are specialists in health care legal compliance issues (Medicare, Medicaid, *etc.*) and offer services which are not widely available in the Grand Rapids market (particularly since Defendants' general counsel could not continue in the litigation). Those rates are reasonable rates for the Washington, D.C. market where the firm is located. The blended rate is based on attorney fee rates as high as $550/hour for Carrie Valiant as well as much lower attorney rates. Carrie Valiant demands a high rate in the market place because of special expertise in the area of health care law. (*See* Dkt. No. 571, 16.) The billings also reflect that the law firm effectively managed work assignments in that research tasks were performed by less experienced attorneys and lesser administrative tasks, such as

---

[9]*See* Defs.' Br. in Support, Ex. C-3.

document collection and review, were performed by legal assistants.  (*See* Defs.' Br. in Supp., Ex. C, C-1 & C-3.)

The D.C. law firm was required to defend the retaliation case because Plaintiff sought to introduce compliance issues into the proofs of her retaliation case.  Plaintiff did so repeatedly and sought to appeal discovery orders and *in limine* orders regarding compliance issues by interlocutory appeal.

## LEGAL STANDARDS PERTAINING TO "BAD FAITH" AWARDS

As noted in the Court's Opinion and Order of September 29, 2005, there are three bases for assessing liability against Plaintiff Mary Scott: inherent authority, Federal Rule of Civil Procedure 26(g) and Rule 56(g).  Of these, inherent authority is obviously the most important because it touches all of Plaintiff's bad faith conduct during the litigation.  A limited award under Rules 26 and 56 would not do justice to the magnitude of the offense.

Inherent authority "bad faith" awards are thankfully rare events in the federal courts, but have proven necessary to prevent wholesale abuse of justice.  In 1975, the Supreme Court decided a famous case, *Alyeska Pipeline Serv. Co. v. The Wilderness Soc.,* 421 U.S. 240 (1975), whose main premise was that the American rule (each side pays its own attorney fees and expenses) is still a predominant feature of our common law legal system.  While saying so, the Supreme Court (Justice White) took pains to observe exceptions to that rule, including the inherent authority exception for cases in which the losing party has acted in bad faith in the litigation.  *Id.* at 529.  One of the cases cited by Justice White for the exception was *Vaughan v. Atkinson*, 369 U.S. 527 (1962).  In *Vaughan*, the Supreme Court approved the award of attorney fees against bad faith respondents in a "maintenance and cure" case.  It did so despite the fact that the common law "maintenance and

cure" doctrine did not include any such award, because if the award were not made in a case in which the right to "maintenance and cure" were clear (*i.e.,* when the respondents were not paying for bad faith reasons), then the effectiveness of the remedy would be undermined.  *See id.* at 533-34.

Justice White returned to the subject of the federal court's inherent authority to award attorney fees and expenses in the case of *Chambers v. NASCO, Inc.*  501 U.S. 32, 56-58 (1991), which affirmed an award of attorney fees and expenses in excess of one million dollars.[10]  In doing so, the Supreme Court reached beyond the limited rule authority to sanction repeated bad faith conduct by a litigant and counsel.  Justice White's words bear repeating:

> *Chambers* maintains that 28 U.S.C. § 1927 and the various sanctioning provisions in the Federal Rules of Civil Procedure[11] reflect a legislative intent to displace the inherent power.  At least, he argues that they obviate or foreclose resort to the inherent power in this case.  We agree with the Court of Appeals that neither proposition is persuasive.  . . .
>
> It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others."  *United States v. Hudson,* 7 Cranch 32, 34, 3 L.Ed. 259 (1812); see also *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764, 100 S. Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (citing *Hudson* ).[12]  For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates."  *Anderson v. Dunn,* 6 Wheat. 204, 227, 5 L.Ed. 242 (1821); *see also Ex parte Robinson,* 19 Wall. 505, 510, 22 L.Ed. 205 (1874).  These powers are "governed

---

[10]The attorney fees and expenses awarded and affirmed by the Supreme Court in *Chambers*, plus appeal fees, were more than one million dollars and amounted to all of *NASCO*'s litigation expenses.  *See Chambers,* 501 U.S. at 40; *NASCO, Inc. v. Calcascieu Telev. & Radio, Inc.*, 894 F.2d 696, 701 (5th Cir. 1990).

[11]The *Chambers* Court considered some of the same sanction provisions applicable in this suit, but determined that such provisions by themselves may not provide sufficient remedy.  *See Chambers*, 501 U.S. at 42 n.8.

[12]The holding in *Roadway Express* authorized inherent authority sanctions for bad faith discovery conduct as well as other related bad faith conduct, though it remanded for a finding as to bad faith.

not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.,* 370 U.S. 626, 630-631, 82 S. Ct. 1386, 1388-1389, 8 L.Ed.2d 734 (1962). . . .

There are other facets to a federal court's inherent power.  The court may bar from the courtroom a criminal defendant who disrupts a trial.  *Illinois v. Allen,* 397 U.S. 337, 90 S. Ct. 1057, 25 L.Ed.2d 353 (1970).  It may dismiss an action on grounds of *forum non conveniens, Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507-508, 67 S. Ct. 839, 842-843, 91 L.Ed. 1055 (1947); and it may act *sua sponte* to dismiss a suit for failure to prosecute, *Link, supra,* 370 U.S., at 630-631, 82 S. Ct., at 1388-1389.

Because of their very potency, inherent powers must be exercised with restraint and discretion.  *See Roadway Express, supra,* 447 U.S., at 764, 100 S. Ct., at 2463.  A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process.  As we recognized in *Roadway Express,* outright dismissal of a lawsuit, which we had upheld in *Link,* is a particularly severe sanction, yet is within the court's discretion.  447 U.S., at 765, 100 S. Ct., at 2463. Consequently, the "less severe sanction" of an assessment of attorney's fees is undoubtedly within a court's inherent power as well.  *Ibid.  See also Hutto v. Finney,* 437 U.S. 678, 689, n. 14, 98 S. Ct. 2565, 2573, n. 14, 57 L.Ed.2d 522 (1978).

Indeed, "[t]here are ample grounds for recognizing ... that in narrowly defined circumstances federal courts have inherent power to assess attorney's fees against counsel," *Roadway Express, supra,* 447 U.S., at 765, 100 S. Ct., at 2463, even though the so-called "American Rule" prohibits fee shifting in most cases.  *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 259, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975).  As we explained in *Alyeska*, these exceptions fall into three categories.  The first, known as the "common fund exception," derives not from a court's power to control litigants, but from its historic equity jurisdiction, . . . , and allows a court to award attorney's fees to a party whose litigation efforts directly benefit others.  *Alyeska*, 421 U.S., at 257-258, 95 S. Ct., at 1621-1622. Second, a court may assess attorney's fees as a sanction for the " 'willful disobedience of a court order.' "  *Id.*, at 258, 95 S. Ct., at 1622 (quoting *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718, 87 S. Ct. 1404, 1407, 18 L.Ed.2d 475 (1967)).  Thus, a court's discretion to determine "[t]he degree of punishment for contempt" permits the court to impose as part of the fine attorney's fees representing the entire cost of the litigation.  *Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399, 428, 43 S. Ct. 458, 466, 67 L.Ed. 719 (1923).

Third, and most relevant here, a court may assess attorney's fees when a party has " 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' "  *Alyeska, supra,* 421 U.S., at 258-259, 95 S. Ct., at 1622-1623 (quoting *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S. Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)).  *See also Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct.1943, 1946, 36 L.Ed.2d 702 (1973); *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, n. 4, 88 S.Ct. 964, 966, n. 4, 19 L.Ed.2d 1263 (1968)

9

(per curiam).  In this regard, if a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party, *Universal Oil, supra,* 328 U.S., at 580, 66 S. Ct., at 1179, as it may when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order."  *Hutto*, 437 U.S., at 689, n. 14, 98 S. Ct., at 2573, n. 14.  The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of "vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy."  *Ibid.*

*Chambers*, 501 U.S. at 42-47 (footnotes omitted).

In light of *Chambers*, the Sixth Circuit has in appropriate cases upheld the assessment of "inherent authority" attorney fees against "bad faith" actors.  *See First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 526 (6th Cir. 2002); *Mann v. Univ. of Cincinnati*, 1997 WL 280188, **8 (6th Cir. May 27, 1997).  Indeed, some Sixth Circuit authority even expands the "inherent authority" powers to cases "tantamount to bad faith."  *See Grinnell Brothers, Inc. v. Touche Ross & Co.*, 655 F.2d 725, 727 (6th Cir. 1981); *Banner v. City of Flint*, 99 Fed. Appx. 29, 37-38 (6th Cir. Apr. 8, 2004).

Before the assessment of "bad faith" sanctions, the parties must be afforded adequate notice and opportunity to be heard (though not necessarily a full evidentiary hearing).  *Wilson-Simmons v. Lake County Sheriff's Dep't*, 207 F.3d 818, 822 (6th Cir.  2000) (citing *Cook v. American S.S. Co.*, 134 F.3d 771, 774-75 (6th Cir. 1998)).  The requirement of "notice and opportunity to be heard," however, must be reconciled with the Supreme Court's admonition in *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983), that attorney fee assessment not become "a second major litigation."  *See also*

*Black v. Lojac Enter., Inc.*, 1997 WL 377051, **5 (6th Cir. July 2, 1997) (following *Hensley*).  In the instant case, the parties have been afforded "notice and opportunity" in the form of briefing of multiple motions specifically relating to the liability and amount of "bad faith" sanctions.

In assessing the attorney fee billings, the Court must apply the words of the Sixth Circuit in *Wooldridge v. Marlene Indus. Corp.,* 898 F.2d 1169, 1173 (6th Cir. 1990), which recognized that the pertinent question in assessing attorney fees:

> [I]s not whether a party prevailed on a particular motion or whether in hindsight the time expenditure was strictly necessary to obtain the relief achieved.  Rather, the standard is whether a reasonable attorney would have believed the work to be reasonably expended in pursuit of success at the point in time when the work was performed.

*Id.* at 1177.

## LEGAL ANALYSIS

As indicated above, this Court has previously found Plaintiff's litigation conduct in this suit to have been in "bad faith" due to her pursuit of the factually baseless retaliation claim as part of a multi-million dollar lawsuit, the intentional concealment of multiple tape recordings, including the crucial minutes tapes, and the filing of intentionally false affidavits on the minutes issue.  The filing and litigation of the retaliation claim was, in light of this record, motivated by an "improper purpose" to harass and extort Plaintiff's former employer.  *See First Bank of Marietta*, 307 F.3d at 524 (citing *Big Yank. Corp v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 314 (6th Cir. 1997)).  In short, this was a case, like *Chambers* and *First Bank of Marietta*, that was long brewed and fermented in the liquor of "bad faith."

As with other cases of this type, the amount of those sanctions, as noted in *Chambers*, must be directed toward the twin objectives of both punishing the wrongdoing (so that it is not repeated)

11

and providing some measure of compensation to those parties victimized by it.  Because "bad faith" attorney fees derive from the Court's broader "inherent authority," the assessment of those fees is not limited by the procedural and statutory authorities pertinent to other attorney fee assessments.  *See Chambers*, *supra*; *First Bank of Marietta,* 307 F.3d at 517.  This is advisable because, since the court rules operate in conjunction with one another, a violation of multiple rules may have the tendency to make the enforcement of many aspects of the rules unjust.  For example, a party opposing a frivolous pleading cannot comply with the "safe-harbor" provision of Federal Rule of Civil Procedure 11(b)(1)(A) when the opposing party has concealed evidence in violation of Rule 26 and has filed false affidavits in violation of Rule 56.

In light of the record, the Court finds, consistent with its prior Opinions and Orders, that the appropriate assessment of attorney fees should reflect the reasonable and actual attorney fees and expenses incurred by Defendants in defending the retaliation claim and the supplemental claims (but excluding the defense of the *qui tam* claims).  The Court finds that both the rates and hours charged by Defendants' attorneys and support staff members were reasonable (with slight exceptions noted below)[13] and were actually and necessarily incurred in this suit.  The Court further finds that the limited use of the Epstein, Becker & Green law firm was reasonable given the need for out-of-town counsel on those issues, that those rates were reasonable given the services required, and that the hours billed were reasonably, actually and necessarily incurred in this suit.  The Court believes that the legal expenses so incurred (including fees for travel, use of legal service databases, *etc.*) were actually, necessarily and reasonably incurred in this suit.  Therefore, the Court determines that

---

[13]Referring to Pl.'s Exs. A & G and two entries on Ex. D of Pl.'s Resp.

attorney fees and costs should be awarded in favor of Defendants and against Plaintiff in the amount of $1,608,268.80.[14]

While the case law does not require that this Court show that the fees and expenses are recoverable under a "lodestar" analysis, nevertheless, as an illustration of their reasonableness, the fees and expenses at issue are recoverable under a lodestar analysis.  The rates at issue are reasonable and consistent with the applicable market rates for attorneys with like experience and skill.  The hours worked were necessary to defense of the retaliation suit.

Such amount is preeminently reasonable in light of the so-called *Johnson* factors:

To aid in determining a lodestar fee and to adjust or enhance a lodestar fee, the district court is also permitted to consult a number of factors specified in the Fifth Circuit case of *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir.1974).  These factors include:

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Blanchard v. Bergeron,* 489 U.S. 87, 91 n. 5, 109 S. Ct. 939, 103 L.Ed.2d 67 (1989) (citing with approval *Johnson*); *see also Paschal v. Flagstar Bank,* 297 F.3d 431, 434-35 (6th Cir. 2002) (same).

*Holford v. Exhibit Design Consultants*, 218 F. Supp. 2d 901, 910 (W.D. Mich. 2002).  In this case, the first, third, fourth, eighth, ninth and eleventh factors (as well as the balance of all factors) militate in favor of recovery of the lodestar fee and might even warrant an enhanced fee.  While the Court

---

[14]The Court has studied the thick billing exhibits for other examples of excessive or unnecessary hours in vain.  The absence of such hours is a tribute to the attorneys' parsimony in not billing excessive or unnecessary hours (with the slight exceptions already noted).

does not believe that an enhanced fee is necessary for the objectives of either punishment (including deterrence) or compensation, the suggestion of the *Johnson* factors nevertheless strongly supports an award of the fee sought by Defendants.

In the course of briefing, Plaintiff has also raised a number of particular objections to the assessment of the monetary sanction, which are summarized in the exhibits filed with Plaintiff's Response.   Plaintiff's first objection, explained in Pl.'s Ex. A, to $65,959.07 of fees was conceded by Defendants and need not be addressed. *See supra* n.7.  Plaintiff's second objection concerns some $21,415.81 of fees for services performed by the attorneys during the retaliation suit relating to legal compliance matters (as asserted in Pl.'s Ex. B).   As noted above, those fees were necessary and reasonably incurred because Plaintiff attempted to insert legal compliance matters into the retaliation proofs.  In light of such, Defendants had no choice but to expend resources on this issue.  Those fees are properly compensated.

Plaintiff's third objection (outlined in Pl.'s Ex. C) is that Defendants should not be compensated for $41,140 of fees incurred in connection which the state law claims, which were dismissed without prejudice.  This objection is flawed in several respects.  Some of the fees included in Exhibit C relate to the retaliation claim and not the state law claims, *e.g.*, the research and evaluation of *res judicata* related to the binding effect of the dismissal of the *qui tam* claims on the federal retaliation claim.   As to those entries which relate only to the state law claims, the Court finds that Defendants are properly compensated for them.  It has been settled law since the decision in *United Mine Workers v. Gibbs,* 383 U.S. 715 (1966), that federal courts, upon dismissal of federal claims, generally dismiss state law claims for comity reasons.  Given such, when a single baseless federal claim is asserted together with pendent state law claims, the filer of the claim has every reason

14

to know that the assertion of the federal claim will cause a simple waste of resources in connection with the state law claims (which must be defended, but will ultimately be decided in another court). Given such, legal expenses incurred in connection with those claims are properly compensated even if the claims have some merit.  In the present case, there is no rationale for not compensating the defense for the state law claims both because jurisdiction was pinned upon a single baseless federal law claim and the state law claims were themselves baseless (though such was determined in *dicta* to permit the exercise of comity by the state courts).

Plaintiff has also objected to $3,175.50 of legal services itemized in Exhibit D.  The services appear for the most part to be legitimate attorney services in connection with the retaliation claim. For example, research and processing of a Freedom of Information Act request under Texas law pertained to valuable work history information concerning one of Plaintiff's prior employers.  Such research and investigation are properly compensable because they are the kinds of work routinely and prudently done by competent counsel and are generally compensable in the relevant market. However, two entries on Exhibit D are not compensable.  There is an entry for one hour of software training ($195) for Anthony Pearson which (though it should have been grouped with Exhibit G) is not allowable for the reasons given in the next paragraph.  The other entry to be disallowed is a two-tenths of one hour entry by Bruce Neckers regarding client consultation as to a mid-suit press release. While the Court believes that such consultations are important attorney services (because otherwise a client might frustrate the client's defense by an untimely or inaccurate statement), such services are generally better described as relating to the client's own marketing and professional development purposes as opposed to success in the suit (which could otherwise be achieved by making no statements to the media).  As such, the consultation ($60) will be disallowed because it was not

essentially related to the defense of the suit.[15]  *See Halderman by Halderman v. Pennhurst State Sch. & Hosp.,* 49 F.3d 939, 942 (3d Cir. 1995); *Hart v. Bourque,* 798 F.2d 519, 523 (1st Cir. 1986); *Greater Los Angeles Council on Deafness v. Cmty. Telev. of S. Cal.,* 813 F.2d 217, 221 (9th Cir. 1987); *Watkins v. Fordice*, 7 F.3d 453, 458 (5th Cir. 1993); *Assoc. Builders & Contractors of La., Inc. v. Orleans Parish Sch. Bd.*, 919 F.2d 374, 380 (5th Cir. 1990); *In re Meese*, 907 F.2d 1192, 1203 (D.C. Cir. 1990); *Am. Petroleum Inst. v. U.S. E.P.A.*, 72 F.3d 907, 913  (D.C. Cir. 1996).

Plaintiff has objected to $1,190 in attorney services performed by Defendants' attorneys in connection with training for use of trial electronic evidence software.  It appears that this suit was the impetus for the training, but that the training will be generally transferable to later suits tried by the attorneys.   While the Court agrees that such training efforts are laudatory and helpful in large litigation efforts such as the present case, the Court agrees with Plaintiff's position that such efforts are not generally compensable as attorney fees.  In saying so, the Court acknowledges the federal case law which broadly construes recoverable attorney fees to include both standard litigation expenses, legal assistant fees and other fees which are routinely billed to paying clients.  *See Missouri v. Jenkins*, 491 U.S. 274, 288-89 (1989); *Norcross v. Bd. of Educ. of Memphis City Sch.*, 611 F.2d 624, 639 (1979).  However, the training hours at issue (precisely because they are generally transferable) are not the kinds of attorney fee hours which, in the Grand Rapids and West Michigan markets, are generally billable to a fee paying client.  *See, e.g., Richards v. Sec'y of Health & Human Serv.,* 884

---

[15]The Court could foresee a case (one involving heavy media statements by the opposing side) in which press releases and media interviews were essential attorney services in defense of the suit (to avoid pre-suit jury persuasion).  However, this is not such a case.  *Cf. Davis v. San Francisco,* 976 F.2d 1536, 1545 (9th Cir. 1992), *vacated in part on other grounds,* 984 F.2d 345 (9th Cir. 1993).  Also, the review of media statements by an opponent is proper investigation in connection with a suit.  *See Meese,* 907 F.2d 1203 n.19.

F. Supp. 256, 260 (N.D. Ohio 1995) (disallowing training time as recoverable fees); *Surge v. Massanari*, 155 F. Supp. 2d 1301, 1305 (M.D. Ala. 2001) (same).  Therefore, those fees will be disallowed.

In addition to Plaintiff's objections to specific billing items, Plaintiff has made several objections to the assessment of attorney fees and expenses.  One such objection is to the billing of legal assistant and law clerk services.  These same objections have previously been rejected by both the Supreme Court in *Jenkins* and this Circuit in *Norcross*, since those Courts properly understood that the billing of such time is a cost-effective use of resources and overall reduces the charges for attorney services.  That objection (including the characterization that some of the time should be attributed to "training") is, therefore, overruled.

Plaintiff has made a general objection that Defendants unnecessarily multiplied fees by not seeking earlier dismissal/summary judgment in the suit.  This is a truly perverse argument because Plaintiff (by withholding discovery and lying in her affidavits) was the essential reason why Defendants could not obtain earlier dismissal of the suit.  As soon as Plaintiff filed the complete affidavit of the taped meeting, Defendants pounced on the information and obtained summary judgment as quickly as was practicable.   The objection is overruled.

Plaintiff has also made a general objection that no fees should be assessed because she has been punished enough by public humiliation in the suit, her own lawyer fees, by her diminished employment prospects and by the loss of an adoption which, according to Plaintiff, was withdrawn after her conduct was documented by the Court.  These injuries, if they have occurred, are self-inflicted and are not the consequence of court sanction.  The Court does not believe that such self-inflicted injury is an effective deterrent for Plaintiff, particularly in the absence of any acknowledged

remorse for past wrongful conduct and particularly in light of the wholesale litigation misconduct which is the subject of this sanction.[16]   Further, the Court believes that the failure to recompense Defendants (who include a not-for-profit health corporation whose very existence was threatened by this suit) for the large costs of a frivolously and vexatiously maintained suit would be wholly unjust and inconsistent with the holdings of such cases as *Chambers* and *First Bank of Marietta*.   This is particularly so since those fees have already been reduced and do not represent the complete  defense costs of the retaliation suit.

To the extent that Plaintiff claims that a large award should not be made because she has limited resources, the Court rejects such argument because the extent of Plaintiff's resources have not been sufficiently documented nor have Defendants yet had discovery on this issue (which usually occurs only post-suit).   Also, Defendants rightly question Plaintiff's assertions given certain information known to them about sizable real estate holdings (a million dollar property in the Grand Rapids area and two expensive homes near Birmingham, Michigan).   (*See infra* and Defs.' Reply Br. 13.)

Having, therefore, determined that Defendants' Motion should be granted in part and denied in part, a judgment for attorney fees shall issue in favor of Defendants and against Plaintiff in the amount of  $1,608,268.80.

---

[16]Plaintiff has also cited the rule in *Danvers v. Danvers*, 959 F.2d 601, 605 (6th Cir. 1992) for the proposition that the sanction imposed should be the "minimum necessary" to dissuade future misconduct.  This is a correct reading of *Danvers* and the case of *Jackson v. Law Firm*, 875 F.2d 1224, 1229-30 (6th Cir. 1989), on which *Danvers* relied.  However, both cases were interpretations of Rule 11, which is now written to include such limitation.  That limitation does not directly apply to "inherent authority" sanctions.  However, even assuming it applied, the sanctions discussed herein are proper because the Court is convinced that no amount of sanction is sufficient to deter Plaintiff from future misconduct and that the other pertinent factor (the need for compensation) weighs out as most significant.

**SETOFF**

Defendants have also applied to setoff its judgment for attorney fees against the monies owed by them to Plaintiff under the *qui tam* Settlement Agreement. The principle of setoff (an old one from the common law) is that if A owes B a liquidated debt and B owes A a liquidated debt, only the net debt need be paid. This practice "avoid[s] the absurdity of making A pay B when B owes A." *In re Malinowski,* 156 F.3d 131, 133 (2nd Cir. 1998). The right of setoff has long been recognized by both federal and state courts. *See, e.g., Nat'l City Bank, N.W. v. Columbian Mut. Life Ins. Co.*, 282 F.3d 407, 409 (6th Cir. 2002); *In re Larbar Corp.*, 177 F.3d 439, 447 (6th Cir. 1999); *Parker Motor Freight, Inc. v. Fifth Third Bank*, 116 F.3d 1137, 1141 (6th Cir. 1997); *Whispering Pines AFC, Home, Inc. v. Dep't of Treasury,* 538 N.W.2d 452, 456 (Mich. Ct. App. 1995).

Setoff issues are typically determined under the state law of the place where the operative facts took place.[17] *In re Britton,* 83 B.R. 914, 918 (Bankr. E.D. N.C. 1988); *Williams v. Am. Bank of the Mid-Cities, N.A.,* 61 B.R. 567, 571 (Bankr. N.D. Tex. 1986). In this case, although the judgment for attorney fees is best regarded as a debt incurred under federal law, the federal common law for the exercise of setoff as to such a judgment debt is not meaningfully distinguishable from Michigan law.

Under Michigan law, the exercise of setoff rights is a matter of equity which is to be left to the trial court's considerable discretion. *Walker v. Farmers Ins. Exch.*, 572 N.W.2d 17, 19 (Mich. Ct. App. 1997) (citing cases); *Blum v. Weinberg*, 2003 WL 1879936, *5 (Mich. Ct. App. 2003). The operation of setoff is well illustrated by an older decision of the Michigan Supreme Court. In *Smith v. Curtiss*, the Michigan Supreme Court held as follows:

---

[17]One notable exception are cases wherein a federal statute provides either a special statutory setoff right or otherwise limits the exercise of setoff rights under state law.

> The court found that the amount of plaintiff's claim in this action was $266.48 and the amount of defendant's set-off was $135.83, and that a proper tender of the difference between said demands was made at the commencement of this suit and still kept good. Under this finding the plaintiff will be entitled to a judgment for $130.65, and the defendant will be entitled to recover costs in the justice's court, the circuit and in this court, and deduct the amount thereof from the amount of the plaintiff's judgment.

*Smith v. Curtiss*, 38 Mich, *1 -2 (Mich. 1878). In other words, the *Curtiss* Court applied two setoffs. First, it setoff the mutual pre-judgment debts. Second, it setoff the costs owed because of the unnecessary litigation of the suit against the plaintiff (who was otherwise owed the balance of the debts).

Defendants' request for relief is made compelling by two recent large financial transactions by the Scott family (Mary Scott and her husband). Defendants have discovered that the Scotts recently moved into a $500,000 home in Birmingham, Michigan and purchased a second home for $290,000 in the name of Mark Scott only. (Defs.' Reply Br. 9.) These recent large purchases suggest that the Scotts may be transferring assets to defeat judgment collection.[18] Although Plaintiff has characterized these transactions differently in her Sur-Reply Brief, even acknowledging her different characterizations, there is still substantial reason to believe that the Scott family members are making large real estate transactions, in part, to avoid collection.[19]

---

[18]Under Michigan law, execution must be levied against personalty first and only secondarily against realty. *See* Mich. Comp. Laws § 600.6017. Realty which is owned by the entireties is protected from levy except for joint debts. *See* Mich. Comp. Laws § 600.2807(1). Execution also would not be possible against real estate held only in the name of Mark Scott since he is not a judgment debtor. If it could be proven that transfers were made to defeat creditors, then transactions might be unwound, *see* Mich. Comp. Laws § 566.16, though sometimes the effort of unwinding such transactions proves a practical impediment to collection.

[19]Plaintiff has filed an expired one-year lease document covering the $500,000 residence which shows that she did not own it (but paid $26,400) in rent for the one-year period expiring in October 2005. It appears that she is still living at that residence and has not disclosed by sworn

Plaintiff does, however, rightly object that the right of setoff is not applicable in this case because Defendants do not owe money directly to her, but instead owe money to the United States and the United States itself owes a portion of the money to Plaintiff. *See United States v. American Prod. Indus., Inc.*, 58 F.3d 404, 408 (9th Cir. 1995). This is true and is a sufficient reason for declining the setoff of funds *per se*. It is not a sufficient reason, however, for not employing other equitable remedies permitted under Michigan law.[20]

Plaintiff has also argued that under the False Claim Act, her receipt of the 18-percent statutory percentage is protected against setoff or other claim for indemnification by the *qui tam* Defendants. This proposition is true as it relates to claims that Defendants might have (for setoff, contribution and the like) against Plaintiff for legal violations by her which gave rise to the False Claims Act allegations. *See Mortgages, Inc. v. U.S. Dist. Court for Dist. of Nev.,* 934 F.2d 209 (9th Cir. 1993); *United States ex. rel. Madden v. Ge. Dynamics Corp.*, 4 F.3d 827, 830-31 (9th Cir. 1993). However, this does not mean (and cannot mean if justice is to be done) that *qui tam* assets are protected from seizure for unrelated claims arising after the *qui tam* events (in this case litigation abuses). The Court

---

statement the nature of her current interest (whether ownership or lease). She has also taken issue with the fact that her Caledonia property is worth $1 million (the sale price), given the S.E.V. is $758,200. Of course, neither the sale price or the S.E.V. is conclusive and the market value is probably somewhere in between. There is no dispute, though, that Mary Scott and Mark Scott presently own the Caledonia residence, while Mark Scott has just purchased another substantial Birmingham property only in his name, and while the couple is either paying an expensive lease for the third property or purchasing it. Any way you slice it, this is a large amount of funds placed into real estate which will be difficult if not impossible to recover by levy or execution at a time when Plaintiff has impending substantial liabilities.

[20]Under Federal Rule of Civil Procedure 64, the procedures for execution and other satisfaction of judgment are those of the law of the forum state.

holds that there is no legal impediment preventing the seizure of Plaintiff's *qui tam* award funds to be applied to the attorney fees judgment in favor of Defendants.

While setoff is not permitted, Michigan law permits a broad array of supplemental and equitable collection remedies under Michigan Compiled Laws § 600.6104. *In re John Richards Homes Bldg. Co.*, L.L.C. 298 B.R. 591, 609 (Bkrtcy. E.D. Mich. 2003). Such remedies are available as part of the Court's equity jurisdiction whenever it is shown on the balance that the following factors favor injunctive relief: (1) justice requires the granting of an injunction; (2) there is no adequate remedy at law; and (3) there is a real and imminent danger of irreparable harm. *Acer Paradise, Inc. v. Kalkaska County Rd. Comm'n*, 684 N.W.2d 903, 910 (Mich. Ct. App. 2004); *Penninsula Sanitation v. City of Manistique*, 526 N.W.2d 607, 611 (Mich. Ct. App. 1994).

Each of the above factors supports equitable relief in this matter. The attorney fees award is made only because of widespread bad faith conduct by Plaintiff. It would be fundamentally unfair to issue such a judgment and permit it to be undermined by collection avoidance. There is no adequate remedy at law if Plaintiff is permitted to obtain the monies and then transfer those monies to the form of exempt assets; such collection avoidance would impose upon Defendants, at the very least, the substantial costs of attempting to vacate such transactions and may as a practical matter defeat any attempt to obtain those monies. Finally, there is a real and imminent danger of such harm. Plaintiff's conduct in this suit has been disreputable and it would be foolish to expect something else in the future. The recent real estate transactions (though possibly legitimate), suggest a real and imminent danger of fraudulent collection avoidance activities within the meaning of Michigan Compiled Laws § 566.16, which might completely undermine an attempt to obtain repayment of the

18-percent *qui tam* funds.  As such, an appropriate order should issue under Michigan Comiled Laws § 600.6104(3) & (5) to prevent disbursement of the non-exempt funds.

What kind of order should issue?  This question was answered in the case of *Rogers v. Webster,* 779 F.2d 52, 1985 WL 13788, *2 (6th Cir. 1985).  Therein, the Sixth Circuit upheld an order of the district court under Mich. Comp. Laws § 600.6104(3) & (5) which required the payment of non-exempt property to the Court's clerk for later distribution to the judgment creditor.[21]  The Court will approve a like order in this case to prevent fraudulent collection avoidance.  As noted below, disbursement of the funds so deposited will be delayed in the event that Plaintiff appeals the Court's judgment and obtains approval of a proper supersedeas bond.

**APPEAL BOND**

Finally, there is the issue of an appeal.  The issue has been raised by Defendants, though of course, it is Plaintiff who must move for the approval of a proper supersedeas bond under Federal Rule of Civil Procedure 62(d) to obtain a stay upon execution.  The parties' briefing focuses on the language of Federal Rule of Appellate Procedure 7 which states that the district court "may require an appellant to file a bond . . . to ensure payment of costs on appeal . . ."  Fed. R. App. P. 7.  This requirement is in addition to the Rule 62(d) requirement for the posting of a supersedeas bond to cover the judgment amount.  *Adsani v. Miller*, 139 F.3d 67, 70 & n.2 (2nd Cir. 1998).[22]

─────────────────

[21]In *Rogers*, the district court also approved the appointment of a receiver, which has not been sought here.

[22]Sixth Circuit cases have routinely required supersedeas bonds as to appeals of substantial attorney fee awards.  *See, e.g., Kennedy v. Uniroyal Pension Plan*, 937 F.2d 608, 1991 WL 134613, *8 (6th Cir. 1991).

As to the "cost" on appeal component of a bond, Plaintiff is right that this Court and others have interpreted Rule 7 as limiting "costs" on appeal to those compensable under Federal Rule of Appellate Procedure 39 (*i.e.,* court fees, copying fees and the like) and as not including attorney fees which may accrue on appeal.  *Donaldson v. Imperial Casualty & Indem. Co.*, 1989 U.S. Dist. LEXIS 17920 (W.D. Mich. 1989) (citing *Fleschmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714 (1967); *In re American President Lines, Inc.*, 779 F.2d 714, 716 (D.C. Cir. 1985), *Baez v. United States Dep't of Justice*, 684 F.2d 999 (D.C. Cir. 1982)); *contra Adsanti*, 139 F.3d at 74.  While there continues to be diverse precedent on this subject, the Court will follow its past precedent absent contrary direction from either the Sixth Circuit or the Supreme Court.

Therefore, the Court will not require a large cost bond, but will require a sufficient cost bond to cover Rule 39 costs.  The Court finds that a $25,000 cost bond is sufficient to cover the costs on appeal.  This amount is in addition to a sufficient supersedeas bond under Rule 62(d), which supersedeas bond should cover both the face amount of costs previously awarded ($18,966.40) plus the face amount of the attorney fees award.  In other words, Plaintiff will provide reasonable security provided that the bond or bonds to be filed are not less than the total amount of $1,652,235.20.  Such bond should be forwarded to the Court for approval within the 10-day automatic stay period under Rule 62(a) to prevent execution after the 10-day period.  Provided that a proper appeal bond is approved, then the Court will not disburse funds paid to the Court's registry or permit other execution or levy pending resolution of the appeal.

**CONCLUSION**

In accordance with the Court's Opinion of this date, a Judgment shall issue granting Defendants' Motion for Attorney Fees and Expenses in part, awarding attorney fees against Plaintiff and in favor of Defendants in the amount of $1,608,268.80, awarding Defendants further equitable relief, and requiring a sufficient bond.

          /s/ Richard Alan Enslen

DATED in Kalamazoo, MI:    RICHARD ALAN ENSLEN
  December 13, 2005     SENIOR UNITED STATES DISTRICT JUDGE